IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

ARSENIO R. AKINS,

       Plaintiff,

    v.                                         Case No. 15-cv-118-bbc

DR. MAIER, et al.,

       Defendants.

## BRIEF IN SUPPORT OF DEFENDANTS'
## MOTION FOR SUMMARY JUDGMENT

       Arsenio Akins, a prison inmate incarcerated at Columbia Correctional Institution (Columbia), sued two corrections' officers and one psychiatrist[1] and alleged that all defendants were deliberately indifferent to his serious medical needs in violation of the Eighth Amendment. He also claims that the psychiatrist is liable to him on a medical negligence theory. Finally, he alleges that the officers retaliated against him for filing offender complaints against them.

       Akins' claims stem from a series of events in June and July of 2014. In short, he alleges that Dr. Gary Maier, a psychiatrist, abruptly discontinued certain psychotropic medication which led to withdrawal symptoms. Akins then reported these symptoms to correctional officer Charles Ribbke and Sergeant Joseph Krasovec and requested medical attention, which Akins claims they ignored. Akins

---

[1] All defendants are employed by the Wisconsin Department of Corrections.

filed offender complaints about the officers' conduct, after which, he alleges, the officers retaliated against him.

Defendants' motion for summary judgment must be granted, as the undisputed facts do not support any claims against Defendants.

## STATEMENT OF THE CASE

This case begins with Akins' claim that Dr. Maier was deliberately indifferent to his medical needs and negligent on June 24, 2014, when Dr. Maier discontinued his prescription for Paroxetine[2] after Akins reported that the drug caused headaches. (Defendants' Proposed Findings of Fact, "DPFOF", ¶¶ 3, 22.) Akins also reported that the Paroxetine was not helping him. (DPFOF, ¶ 24.) Even though Dr. Maier did not believe the Paroxetine caused Akins' reported symptoms, the doctor agreed to discontinue Paroxetine and prescribed Fluoxetine as a replacement. (DPFOF, ¶ 25.) Akins did not receive the Fluoxetine until July 3, 2014, nine days after Dr. Maier ordered the medication. (DPFOF, ¶ 33.) But, only five days after the Paroxetine was discontinued, he was put back on the drug by an on-call physician after he reported alleged withdrawal symptoms on June 29. (DPFOF, ¶ 36.)

Although Akins believes that he suffered adverse effects as a result of being without certain medication for five days, Dr. Maier remains confident in his decision to discontinue the Paroxetine, even in the absence of a "stat" replacement drug for

---

[2] Paroxetine is an antidepressant drug in the selective serotonin reuptake inhibitors class (SSRIs). Paroxetine is most commonly used to treat depression, obsessive-compulsive disorder, anxiety disorders, and post-traumatic stress disorder. Venlafaxine is also an SSRI. (DPFOF, ¶ 10.)

various reasons, described more fully in Section II.A., below. Even if Akins suffered withdrawal symptoms related to the medication discontinuation (in his complaint Akins alleged he suffered chest pain, stomach cramps, memory loss, dizziness, headaches, and nausea but he only reported difficulty sleeping, headache, dizziness, and vision problems when he was seen in HSU on 6/29/14). These symptoms are not life-threatening and do not form the basis of a constitutional claim. (DPFOF, ¶¶ 29, 32.)

Akins reported alleged withdrawal symptoms to security staff on his unit, Officer Ribbke and Sergeant Krasovec, at approximately 11:10 a.m. on June 29, 2014, five days after the Paroxetine had been discontinued. (DPFOF, ¶¶ 42, 43.) Akins was seen in the prison's Health Services Unit (HSU) at 4:50 p.m. (DPFOF, ¶ 47.) In Dr. Maier's absence, a nurse contacted the on-call physician, who ordered a restart of Paroxetine until the prison received the Fluoxetine. (DPFOF, ¶ 36.) Akins' vital signs were normal and the nursing diagnosis was "alteration in comfort." *Id.* Akins filed an offender complaint regarding Ribbke and Krasovec's response to his request for medical attention on June 29. (DPFOF, ¶ 52.) Krasovec was contacted about the complaint, Ribbke was not. (DPFOF, ¶¶ 52, 53, 102, 104.)

On July 7, 2014, Akins reported that he was light-headed to Ribbke and Krasovec at 11:40 a.m. (DPFOF, ¶ 57.) Krasovec contacted HSU and Akins was seen at 12:50 p.m., less than an hour after Akins' first complaint of dizziness. (DPFOF, ¶ 60.) Krasovec wrote Akins a conduct report for disobeying orders to

return to his cell and for disruptive conduct. (DPFOF, ¶ 61.) Details regarding this exchange are more fully described in Section III.A., below.

On July 16, 2014, Ribbke conducted a cell search during which Akins claims Ribbke broke his electric razor and poured out his prayer oil. Ribbke denied these allegations and wrote an informational incident report, wherein he directed Akins to submit an Offender Complaint, if Akins believed it was appropriate. (DPFOF, ¶ 82.) Ribbke forwarded this incident report to his supervisor. *Id.* Ribbke's cell search uncovered minor property violations, but Ribbke did not write up Akins for the violations. (DPFOF, ¶¶ 75, 77, 79.) Ribbke has never written a conduct report for Akins, as further described in Section III.B., below. (DPFOF, ¶ 91.)

## SUMMARY JUDGMENT STANDARD

Pursuant to Fed. R. Civ. P. 56(c), summary judgment is appropriate when there is no genuine issue as to any material fact and when the moving party is entitled to a judgment as a matter of law. The moving party seeking summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (citation omitted). "[A]n adverse party may not rest upon the mere allegations or denials of his pleadings, but his response . . . must set forth specific facts showing that there is a genuine issue for trial." *Id.* at 338.

- 4 -

There is a genuine issue of material fact only if any of the disputed facts might affect the outcome of the case. *First Ind. Bank v. Baker*, 957 F.2d 506, 507-08 (7th Cir. 1992). A dispute concerning facts that are not material to a determinative issue does not preclude summary judgment. *Donald v. Polk Cnty.*, 836 F.2d 376, 379 (7th Cir. 1988). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The moving party is "entitled to a judgment as a matter of law" when the nonmoving party has failed to make a sufficient showing on an essential element of his case with respect to which he has the burden of proof. *Celotex Corp.*, 477 U.S. at 338. If the nonmoving party "cannot muster sufficient evidence to make out its claim, a trial would be useless and the moving party is entitled to summary judgment as a matter of law." *Id.* at 331.

## ARGUMENT

### I.   Applicable Legal Standards.

#### A.   Standard for Eighth Amendment Deliberate Indifference Claim.

The Eighth Amendment prohibits cruel and unusual punishment, and it imposes on states, through the Fourteenth Amendment, the duty to provide medical care to prisoners. *Williams v. Liefer*, 491 F.3d 710, 714 (7th Cir. 2007). Prison officials who are deliberately indifferent to an inmate's serious medical needs

violate the Constitution. *Id.* To prove deliberate indifference to a serious medical need, the plaintiff must meet an objective standard and a subjective standard. *Dunigan v. Winnebago Cnty.*, 165 F.3d 587, 590 (7th Cir. 1999). First, the plaintiff must prove he or she suffers from a serious medical condition. *Id.*

Second, he or she must prove a subjective element—that the state official acted with a culpable state of mind, which is deliberate indifference. *Id.* at 590-91. This is a high standard; it requires proof that the state officials actually knew of the inmate's serious medical need and that they disregarded it. *Walker v. Benjamin*, 293 F.3d 1030, 1037 (7th Cir. 2002). "[A]n inmate has no claim unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Dale v. Poston*, 548 F.3d 563, 569 (7th Cir. 2008) (internal quotation marks omitted; citation omitted). Even if a prison official failed to alleviate a significant risk of harm he or she should have perceived, there is no liability without actual knowledge. *Whiting v. Marathon Cnty. Sheriff's Dep't*, 382 F.3d 700, 704 (7th Cir. 2004).

In evaluating a claim that prison officials knew of an inmate's serious medical need but disregarded it, the court examines the "totality of an inmate's medical care[.]" *Dunigan*, 165 F.3d at 591. Isolated instances of negligent acts by state actors are not actionable under the Eighth Amendment. *See, e.g., Zentmyer v. Kendall Cnty., Ill.*, 220 F.3d 805, 811 (7th Cir. 2000). Neither is medical

malpractice. *Estelle v. Gamble*, 429 U.S. 97, 106 (1976). An Eighth Amendment claim requires far more than proof of disagreement with a medical professional's medical judgment. A prisoner has no constitutional right to choose his treatment. *Snipes v. DeTella*, 95 F.3d 586, 591 (7th Cir. 1996). As the Supreme Court noted in *Gamble*:

> [T]he question whether an X-ray or additional diagnostic techniques or forms of treatment is indicated is a classic example of a matter for medical judgment. A medical decision not to order an X-ray, or like measures, does not represent cruel and unusual punishment.   At most it is medical malpractice, and as such the proper forum is the state court . . . .

*Gamble*, 429 U.S. at 107. The standard formulated by the Seventh Circuit requires proof of much more than medical malpractice:

> [D]eliberate indifference may be inferred based upon a medical professional's erroneous treatment decision only when the medical professional's decision is such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible did not base the decision on such a judgment.

*Estate of Cole by Pardue v. Fromm*, 94 F.3d 254, 261-62 (7th Cir. 1996). Similarly, a claim that the care an inmate received was not as quick or efficient as he would have desired does not, without more, raise his claims to the level of a constitutional violation. *Lee v. Akture*, 827 F. Supp. 556, 560 (E.D. Wis. 1993).

It is well-settled law that mere delay does not constitute deliberate indifference. *Langston v. Peters*, 100 F.3d 1235, 1240 (7th Cir. 1996). For example, in *Gutierrez v. Peters*, 111 F.3d 1364, 1373 (7th Cir. 1997), isolated incidents of delay, during ten months of prompt, extensive treatment did not amount to deliberate indifference. *Id.* at 1373. Similarly in *Dunigan*, the court found that "factual highlights" of neglect over a month and a half of otherwise unobjectionable

treatment were insufficient to avoid summary judgment. *Dunigan*, 165 F.3d at 591. It is incumbent upon an inmate who complains that delay in medical treatment rose to a constitutional violation to place "***verifying medical evidence*** in the record to establish the detrimental effect of delay[.]" *Id.* (emphasis in original) (quoting *Beyerbach v. Sears*, 49 F.3d 1324, 1326 (8th Cir. 1995)).

### B.     Negligence.

A claim for medical malpractice, as all claims for negligence, requires the following four elements: (1) a breach of (2) a duty owed (3) that results in (4) an injury or injuries, or damages. *Paul v. Skemp*, 2001 WI 42, ¶ 17, 242 Wis. 2d 507, 625 N.W.2d 860.

### C.     Retaliation.

In general, a prisoner has a First Amendment right to challenge the conditions of his or her confinement by, for example, filing grievances and lawsuits, and it is unlawful for prison officials to retaliate against a prisoner for exercising this right. *See Walker v. Thompson*, 288 F.3d 1005, 1009 (7th Cir. 2002); *Babcock v. White*, 102 F.3d 267, 274–75 (7th Cir. 1996).

To establish a retaliation claim, a plaintiff must establish three elements: first, that he or she engaged in constitutionally protected conduct, *e.g.*, filing grievances or lawsuits challenging the conditions of the plaintiff's confinement in prison; second, that but for the protected conduct a defendant would not have taken an adverse action against the plaintiff; and third, that the plaintiff suffered a deprivation because of the defendant's action. *See Gunville v. Walker*, 583 F.3d 979,

983–84 & n.1 (7th Cir. 2009); *Fairley v. Andrews,* 578 F.3d 518, 525–26 (7th Cir. 2009).

## II.    Defendant Dr. Maier is entitled to summary judgment on Akins' Eight Amendment and negligence claims.

Akins claims that Dr. Maier was deliberately indifferent to his medical needs—or, at a minimum, negligent—with respect to the manner in which he discontinued certain psychotropic medication in June of 2014. (Dkt. 1 at 4.) Contrary to that alleged by Akins, Dr. Maier provided consistent, thorough psychological care to him and prescribed medications in accordance with Akins' stated desires. In fact, the only reason that Dr. Maier discontinued the medication is because Akins complained that same did not help him and caused undesired side effects.

### A.    Defendant Dr. Maier was not deliberately indifferent to Akins' medical needs.

Akins' claim for deliberate indifference fails for two reasons. First, he cannot establish that he suffered a serious medical need as a result of Dr. Maier's conduct. Second, even if he could establish a serious medical need, the undisputed facts establish that Dr. Maier was attentive and responsive to Akins' concerns and needs, and therefore did not violate Akins' constitutional rights.

- 9 -

i. **Akins did not suffer from a serious medical condition as a result of the alleged constitutional violation by Dr. Maier.**

To establish that Dr. Maier violated his constitutional rights, Akins must first establish that he suffered from a serious medical need. *Dunigan*, 165 F.3d at 590. He cannot meet this initial threshold determination and for that reason, his claim fails.

In determining whether a plaintiff has established a serious medical need, the condition itself does not necessarily establish a medical need. *See, e.g., Jackson v. Pollion*, 733 F.3d 786 (7th Cir. 2013). "No matter how serious a medical condition is, the sufferer from it cannot prove tortious misconduct (including misconduct constituting a constitutional tort) as a result of failure to treat the condition without providing evidence that the failure caused injury or a serious risk of injury. For there is no tort—common law, statutory, or constitutional—without an injury, actual or at least probabilistic." *Id.* at 790.

Akins' chief complaint is that Dr. Maier "abruptly" stopped his medication which led to withdrawal symptoms. (Dkt. 1 at 4.) Akins reported symptoms, even if related to the discontinuation of the medication, are not medical emergencies or life threatening. (DPFOF, ¶¶ 29, 30, 41.) When Akins was examined on June 29 and July 7, his vitals were normal and his subjective complaints were not corroborated by any objective evidence of any serious injury. (DPFOF, ¶¶ 36, 65.) Further, Akins' chief complaint associated with the discontinuation of the Paroxetine (and supported in the medical records) are headaches, which Akins had already associated as a side effect of the medication that he wanted to discontinue.

(DPFOF, ¶ 22.) Under these circumstances, it is impossible to causally link Akins' reported symptoms to the discontinuation of the medication.

### ii.    Akins cannot establish that Dr. Maier acted with the scienter required to establish a constitutional violation.

Even if Akins is able to satisfy the first element (which he cannot), Akins must also show that Dr. Maier had actual knowledge of a serious medical need and intentionally disregarded it. Akins can make no such showing.

The evidence establishes that Dr. Maier engaged in a reasoned course of diagnosis and treatment of Akins and his psychological conditions.

Dr. Maier first treated Akins in April 2013, when Akins transferred to Columbia. (DPFOF, ¶ 7.) At that time, Dr. Maier noted Akins' diagnoses of adjustment disorder with disturbance of mood/depression, attention deficit/hyperactivity disorder (ADHD).[3] (DPFOF, ¶ 8.)

Dr. Maier first prescribed Paroxetine on February 19, 2014 after Akins reported that he stopped taking Venlafaxine (an antidepressant) that Dr. Maier had prescribed because it was causing side effects. (DPFOF, ¶ 9.)

Dr. Maier saw Akins again on March 19, 2014. Akins reported that he never received the medication information sheet for Paroxetine so he did not start taking the medication because he wanted to read the information first. (DPFOF, ¶ 14.) Dr. Maier noted that Akins was concerned about medications and he felt that at times he had been overdosed or given the wrong medication, and therefore, he

---

[3] Akins does not have a diagnosis of adult ADHD and during Dr. Maier's treatment of Akins, Dr. Maier never observed signs of adult ADHD. (DPFOF, ¶ 8.)

wanted to be cautious. *Id.* Dr. Maier re-ordered the medication information sheet and a follow-up appointment in two weeks to discuss his progress. (DPFOF, ¶ 15.)

Dr. Maier next saw Akins on April 2, 2014 at which time Akins reported that he started taking the Paroxetine as prescribed and he tolerated it with no side effects. Akins agreed with the doctor's recommendation to increase the dose from 20 mg to 40 mg. (DPFOF, ¶ 16.)

Seven weeks later, on May 28, 2014, Akins had a follow up appointment with Dr. Maier and reported no issues with the Paroxetine. (DPFOF, ¶¶ 18, 19, 20.)

Akins first complained of symptoms that he believed were related to Paroxetine on June 24, 2014. (DPFOF, ¶ 22.) Dr. Maier did not believe that the reported headaches were related to the Paroxetine, because side effects typically occur within 2-3 weeks of starting a medication, and Akins had been on the Paroxetine for several months with no complaints. (DPFOF, ¶¶ 22, 23.) Regardless, Dr. Maier agreed to discontinue Paroxetine at Akins' request, primarily because Akins did not feel that it was helping him. (DPFOF, ¶ 24.)

When Dr. Maier discontinued the Paroxetine on June 24, 2014, it was his expectation that the replacement medication would arrive about the time the Paroxetine would be washed out of Akins' system. (DPFOF, ¶ 28.) Dr. Maier was aware that the new drug would not start immediately, as any new medications must be approved by a pharmacist at Corrections' central pharmacy, processed by the pharmacy, and then sent to the institution. (DPFOF, ¶ 33.) While it is possible to order a medication "STAT" (on-demand), which would shorten the wait time for

the drug to reach Columbia, Dr. Maier did not believe that it was necessary because Akins still had Paroxetine on board and because it is not a common practice to do so for antidepressants. In fact, Akins willingly discontinued other, similar drugs without medical consult or any apparent withdrawal symptoms, which shows that he was willing to be un-medicated. (DPFOF, ¶¶ 28, 34.) Even if Akins had withdrawal symptoms associated with Paroxetine, none are life threatening. (DPFOF, ¶ 41.)

And, significantly, Akins did not need a "STAT" antidepressant order because he did not have a serious clinical condition requiring "STAT" treatment. (DPFOF, ¶ 35.) In sum, in Dr. Maier's opinion, the risk of withdrawal symptoms did not outweigh the benefits of being taken off the medication because the medication caused headaches and did not provide positive results. (DPFOF, ¶ 30.)

Dr. Maier's next appointment with Akins was on July 10, 2014, seven days after he started taking Fluoxetine. (DPFOF, ¶ 32.) Akins reported that he did not think the Fluoxetine was working. (DPFOF, ¶ 37.) Because the drug would take 2-3 weeks to take effect, Dr. Maier believed that Akins was not interested in giving the medication a chance to work and was instead seeking other medication. (DPFOF, ¶ 37.[4])

Dr. Maier agreed to discontinue the Fluoxetine and start Klonopin, a drug used to treat panic disorders. (DPFOF, ¶ 38.) During this same time, Dr. Maier

---

[4] The fact that Akins was frequently requesting new medications led Dr. Maier to believe that Akins was seeking Adderall, a drug with the potential for abuse in prison. In fact, Akins was eventually given Adderall, immediately abused it, and was removed. (DPFOF, ¶ 40.)

noted that Akins' migraine headaches were being addressed by his medical doctor, which led Dr. Maier to conclude that the migraines were not caused by Paroxetine. (DPFOF, ¶ 39.)

The undisputed evidence establishes that Dr. Maier saw Akins on February 19, March 19, April 2, May 28, and June 24. (DPFOF, ¶¶ 9, 14, 16, 18, 21.) When Akins requested a medication change, Dr. Maier was willing to try it, even though he questioned Akins' sincerity. (DPFOF, ¶ 40.) After Akins reported symptoms that he associated with Paroxetine, Dr. Maier agreed to start a new medication. (DPFOF, ¶ 38.) Dr. Maier stopped the Paroxetine rather than tapering because the latter would not reduce the side effects of which Akins complained. (DPFOF, ¶¶ 30, 31.) Dr. Maier's decisions were made with the intent to reduce Akins' complaints and to discontinue a drug that Akins said was not working. He was not deliberately indifferent.

## B.    Dr. Maier was not negligent.

Akins cannot establish that Dr. Maier was negligent for two reasons. First, the undisputed facts establish that Dr. Maier responded to Akins' needs every step of the way. Dr. Maier cannot be held liable for the negligence of others, if any, for the five-days that Akins went without medication (though Dr. Maier believes it was not necessary). (DPFOF, ¶¶ 26, 28.) During this time, Dr. Maier had no knowledge that Akins suffered from serious symptoms that he associated with the (lack of) medication. This case may be different if Dr. Maier knew of side effects that presented a serious risk to the Plaintiff. And, Dr. Maier had already built in time

for the Paroxetine to leave Akins' system, and made a reasonable medical judgment to discontinue (rather than taper) the medication because tapering would not stop the side effects that Akins wished to avoid.

Second, Akins cannot establish a causal connection between his reported symptoms to the discontinuation of the Paroxetine. Akins complains that the Paroxetine caused headaches, but he claims that the withdrawal symptoms also included headaches, and he agreed to return to the Paroxetine after five days off of the drug. His claim is confusing, at best.

Dr. Maier did not breach any duty to Akins. The "concept of duty in Wisconsin, as it relates to negligence cases, is inexorably interwoven with foreseeability." *Schuster v. Altenberg*, 144 Wis. 2d 223, 236-37, 424 N.W.2d 159 (1988). There is nothing in the record that suggests that Dr. Maier should have foreseen that a discontinuation of a medication that was not helping Akins and, in fact, causing his issues would have led to side effects that Akins would consider more distressing than those he suffered while on the drugs. Dr. Maier was not negligent.

## III. Defendant Krasovec and Ribbke are entitled to summary judgment on Akins' Eighth Amendment claim.

Akins sued Officer Ribbke and Sergeant Krasovec and alleges that they were deliberately indifferent to his serious medical need by the manner in which they responded to his requests for medical treatment on June 24, 2014 and July 7, 2014.

Akins cannot establish that the officer defendants were deliberately indifferent to his medical needs because the undisputed evidence establishes that

each time that Akins requested to be seen by HSU, the officers contacted HSU and he was seen in HSU. Akins' claim borders on frivolous, as he was seen in HSU within hours of complaining to the officers on June 29 and within <u>one hour</u> on July 7.

### A.    June 29, 2014

Akins claims that on **June 29, 2014**, Ribbke and Krasovec ignored his requests to for medical attention. (Dkt. 1 at 4.) Akins alleges that he went to both Ribbke and Krasovec and "begged them to contact HSU or take him to HSU or call a nurse for him." (*Id.*) He claims that Krasovec eventually called HSU, but only after he threatened Akins with a conduct report.[5] According to Akins, Krasovec purposefully gave HSU false information—that Akins had just returned from recreation—in an effort to delay medical treatment. (*Id.*) In fact, Akins did not attend recreation on June 29. Akins claims that because HSU was told that he had been to recreation, they assumed that he was dehydrated and did not order care beyond telling the plaintiff to drink water and rest.

What Akins seemingly ignores is the fact that Krasovec did not ignore his request to be seen by HSU, but actually contacted HSU when Akins complained to him. HSU told Krasovec to tell Akins to rest and drink. (DPFOF, ¶ 43.) Krasovec did not believe that Akins experienced a medical emergency, and even though Akins claimed he was dizzy, he was able to walk normally. (DPFOF, ¶¶ 48, 49.) If

---

[5] The only conduct report that Krasovec wrote for Akins is dated July 7, 2014. (DPFOF, ¶ 92.)

Krasovec thought Akins had a medical emergency, he would have arranged for his immediate transfer to HSU. (DPFOF, ¶ 50.)

To the extent that Akins alleges that Ribbke and Krasovec should have done something other than that directed by HSU, that claim is readily dismissed. Ribbke and Krasovec are not medical professionals and were entitled to rely on the medical opinions of the nurse. *See King v. Kramer*, 680 F.3d 1013, 1018 (7th Cir. 2012).

"Except in the unusual case where it would be evident to a layperson that a prisoner is receiving inadequate or inappropriate treatment, prison officials may reasonably rely on the judgment of medical professionals." *Johnson v. Doughty*, 433 F.3d 1001, 1011 (7th Cir. 2006) (citation omitted). *See also Greeno v. Daley*, 414 F.3d 645 (7th Cir. 2005). Such reliance does not constitute deliberate indifference. *Bond v. Aguinaldo*, 228 F. Supp. 2d 918, 920 (N.D. Ill. 2002).

If a prisoner is under the care of medical experts, a non-medical prison official will generally be justified in believing that the prisoner is in capable hands. *Spruill v. Gillis*, 372 F.3d 218, 236 (3d Cir. 2004). As reasoned by the court in *Spruill*:

> This follows naturally from the division of labor within a prison. Inmate health and safety is promoted by dividing responsibility for various aspects of inmate life among guards, administrators, physicians, and so on. Holding a non-medical prison official liable in a case where a prisoner was under a physician's care would strain this division of labor. . . .
>
> Accordingly, we conclude that, absent a reason to believe (or actual knowledge) that prison doctors or their assistants are mistreating (or not treating) a prisoner, a non-medical prison official like Gooler will not be chargeable with the Eighth Amendment scienter requirement of deliberate indifference.

*Id.*

- 17 -

Akins cannot establish an Eighth Amendment claim against either officer related to their conduct on June 29. Further, both officers' shifts were over at 2:00 p.m. on June 29, so the officers cannot be held liable for anything that happened during the three hours after their shift and before Akins was seen in HSU. (DPFOF, ¶¶ 46, 47.)

Interestingly, while at the same time complaining of head, chest, and stomach pain, sweating, weakness, and "unbearable" nausea and dizziness, Akins was nevertheless able to author a two page, clear, coherent, hand-written Offender Complaint that he submitted through the prison's inmate complaint system on June 29, 2014. (DPUF ¶ 32.) He notes that as of 3:00 p.m., he had not yet been seen by HSU. *Id.* Two hours later, he was seen. (DPFOF, ¶¶ 47, 36.) At that time, he reported chest pain, inability to sleep, and dizziness. *Id.* He was examined by the nurse, and his vitals were normal. *Id.* The nurse made telephone contact with the on-call doctor, who restarted the Paroxetine in light of Akins' subjective complaints that the symptoms were related to withdrawal.   No further treatment was necessary. (DPFOF, ¶ 36.)

## B.    July 7, 2014

Akins claims that requests for medical attention for his dizziness went ignored by Ribbke during mail pass on July 7, 2014. (Dkt. 1 at 5.) Once again, Akins claims that when he approached Krasovec about the issue, Krasovec also refused him access to medical care. (*Id.*) But, the undisputed evidence establishes Krasovec contacted HSU when Akins brought health concerns to him and, in fact, Akins was

seen in HSU at 12:50 p.m., less than an hour after he first complained to Krasovec. (DPFOF, ¶¶ 57, 60.)

Akins approached Krasovec at 11:40 a.m. at the officer desk and complained that he was light headed. (DPFOF, ¶ 57.) Akins appeared normal, and, in fact spoke in a loud and demanding voice which prompted Krasovec to order him back to his cell, but only after Krasovec attempted to contact HSU. *Id.* Akins became argumentative and stated, "You are refusing me medical attention." Krasovec gave Akins three direct verbal orders to return to his cell, and after the third order, Akins complied. (DPFOF, ¶ 58.)

Akins' behavior got the attention of several inmates who were in the dayroom for lunch, it was disruptive, and it slowed the noon medications pass on the unit. (DPFOF, ¶ 59.) Krasovec ultimately reached HSU and Akins' was seen at approximately noon. (DPFOF, ¶ 60.) Details regarding the conduct report follow in the next section.

## IV. Krasovec and Ribbke did not retaliate against Akins for engaging in constitutionally protected speech.

Akins alleged that Ribbke and Krasovec retaliated against him for using the inmate complaint system by refusing his requests for medical treatment, destroying his personal property, writing a false conduct report, and making threatening statements after Akins filed the complaints. Akins' retaliation claim must be dismissed.

The first inmate complaint that Akins filed against defendants Ribbke and Krasovec was Complaint No. CCI-2014-12680 and in the complaint, Akins alleged that the officers refused him medical care on June 29, 2014.[6] (DPFOF, ¶¶ 52, 99.)

The inmate complaint examiner interviewed Krasovec and consulted with the unit's logbook before he dismissed the complaint on July 7, 2014. (DPFOF, ¶¶ 102, 103.) Ribbke was not contacted about this complaint, and was unaware that the complaint existed, so it is impossible to conclude that Ribbke retaliated against Akins in any way on the basis of any complaint that Akins may have filed against him. (DPFOF, ¶¶ 104, 87.)

Akins filed at least five other offender complaints relating to Ribbke, Krasovec, or both. (DPFOF, ¶¶ 93, 109, 112, 116, 120.) Offender complaints are handled with the utmost confidentiality, and the prison's complaint examiners only interview staff as necessary in order to investigate the complaint. (DPFOF, ¶¶ 100, 101.) Complaint examiners do not contact staff if the offender complaints are rejected. (DPFOF, ¶¶ 108, 119.) Krasovec was not contacted about any of the other offender complaints (other than the one filed June 30, 2014) that pre-date the conduct report that he wrote on July 7. (DPFOF, ¶¶ 93, 106, 107, 109, 111, 112, 113, 116, 119.) Until this lawsuit, Ribbke was unaware of any complaints filed by Akins against him (other than the complaint about the cell search, which necessarily occurred *after* the cell search and therefore cannot be a basis of Akins' retaliation claim).

---

[6] For the reasons previously stated, the record is devoid of evidence to support this claim.

Clearly Akins was not dissuaded from filing offender complaints against the officers in the weeks that followed June 29, 2014, and, more significantly, the officers had no knowledge that he had done so. If the officers had no knowledge that he filed complaints against them, Akins cannot establish that they retaliated against him in response thereto.

On **July 7, 2014**, Krasovec authored a conduct report which Akins alleges was retaliatory and in response to the offender complaint submitted on June 29, 2014. (DPFOF, ¶ 61.) In fact, Krasovec wrote the report only after Akins disobeyed his direct orders to return to his cell and disrupted the dayroom during medication pass. *Id.* Akins received a full disciplinary hearing after this conduct report, after which he was found guilty of violating institution rules and he received a disposition of 10 days loss of recreation and dayroom. (DPFOF, ¶ 64.) Akins filed at least two other offender complaints regarding Krasovec in July 2014, neither of which were brought to Krasovec's attention before they were rejected or dismissed. (DPFOF, ¶¶ 93, 94.)

On **July 16, 2014**, Ribbke conducted a cell search during which he alleges that Ribbke poured out his prayer oil and broke his electric razor as retaliation for the June 29 offender complaint. It is undisputed that Ribbke conducted a cell search[7] on July 16, but Ribbke denies any wrongdoing. (DPFOF, ¶ 75.) Ribbke conducted six searches on that day and logged the searches in the unit logbook.

---

[7] Cell searches are completed regularly and documented in the housing unit search log book. They are done at the direction of the unit manager with the purpose of ensuring that inmates are compliant with property limits and preventing the introduction of contraband into the prison. If an inmate is found to have contraband, they may receive a conduct report, which are written at the staff member's discretion. (DPFOF, ¶¶ 69-74.)

(DPFOF, ¶ 76.) Of the six cells searched, Akins and two other inmates were found in violation of institution rules, such as possession of cut-outs, excess linen, and overdue library books. (DPFOF, ¶ 77.) Ribbke made notes in the log book but did not issue a conduct report to Akins. (DPFOF, ¶¶ 78, 79.) In fact Ribbke has never issued Akins a conduct report. (DPFOF, ¶ 91.) Ribbke confiscated property from another inmate, however, but did not confiscate the razor that Akins alleged was broken. (DPFOF, ¶ 78.) If Ribbke had observed a damaged razor, it would have been confiscated as contraband because a damaged razor is considered very dangerous contraband because it can be used as a weapon. (DPFOF, ¶¶ 83, 84.)

Akins' retaliation claim has no basis in law or fact. His most logical claim is that defendants Ribbke and Krasovec denied him access to medical care in retaliation for filing the offender complaint on June 29, 2014. In fact, on July 7, 2014, when Akins asked to be seen by HSU, he was seen within one hour.

Next, although Krasovec wrote a conduct report for Akins' actions on July 7, 2014, he had a reason for doing so and, Krasovec had ensured that Akins was seen in HSU on that date—and in less than an hour following his first complaint. (DPFOF, ¶¶ 61, 62, 63.)

Finally, on July 16, 2014, Ribbke could have written up Akins for excess linen found in his cell during a cell search. But, he didn't. (DPFOF, ¶¶ 79, 80.) On July 16, 2014, Ribbke didn't have to memorialize the alleged retaliatory incident in a written report and submit it to his supervisor. But, he did. (DPFOF, ¶¶ 81, 82.) A

fact finder simply cannot find that Ribbke retaliated against Akins under these circumstances.

## V.   All Defendants are entitled to qualified immunity on Akins' Eighth Amendment claims.

Government officials performing discretionary functions are shielded from damage liability insofar as their conduct does not violate clearly established statutory or constitutional rights. *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). This defense relates to official acts, not to unofficial conduct. *Clinton v. Jones*, 520 U.S. 681, 694 (1997). The qualified immunity defense "gives public officials the benefit of legal doubts." *Elliott v. Thomas*, 937 F.2d 338, 341 (7th Cir. 1991). All but the "plainly incompetent" officials are protected. *Malley v. Briggs*, 475 U.S. 335, 341 (1986). Violation of clearly established state law is irrelevant. It is federal law that must be clearly established if the plaintiff is to overcome the defense. *Davis v. Scherer*, 468 U.S. 183, 194 (1984).

Although qualified immunity is an affirmative defense, the plaintiff has the burden of demonstrating that defendant's error was clearly established:

> [W]e emphasized in *Anderson* "that the right the official is alleged to have violated must have been 'clearly established' in a more particularized, and hence more relevant, sense: The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right."

*Saucier v. Katz*, 533 U.S. 194, 202 (2001) (citation omitted), *overruled on different grounds*, *Pearson v. Callahan*, 555 U.S. 223 (2009).

The issue of qualified immunity is a question of law for the court. *Hunter v. Bryant*, 502 U.S. 224, 228 (1991) (*per curiam*). The United States Supreme Court

recently held that it is no longer mandatory to "decide whether the facts that a plaintiff has alleged . . . make out a violation of a constitutional right" in the qualified immunity analysis. *Pearson*, 555 U.S. at 232. Instead, a court may go directly to the question of "whether the right at issue was 'clearly established' at the time of defendant's alleged misconduct." *Id.* ("The judges of the district courts and the courts of appeals should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand.") *Id.* at 236.

A factual dispute does not require denial of the defense. Qualified immunity may be available to a defendant "even if the existence of disputed issues of fact precludes a grant of summary judgment on the merits." *Green v. Carlson*, 826 F.2d 647, 652 n.4 (7th Cir. 1987). Evidence concerning a defendant's subjective intent is "simply irrelevant." *Crawford-El v. Britton*, 523 U.S. 574, 588 (1998). The *Harlow* rule rejects an inquiry into state of mind in favor of a wholly objective standard. *Davis*, 468 U.S. at 191. Thus, except in extraordinary circumstances, a public official's actual knowledge is irrelevant to the determination of whether there is immunity from suit. *McKinley v. Trattles*, 732 F.2d 1320, 1324 (7th Cir. 1984). An allegation of malice does not defeat immunity if the defendant acted in an objectively reasonable manner. *Malley*, 475 U.S. at 341. Similarly, acting out of spite is irrelevant if the conduct is objectively lawful. *Anderson v. Romero*, 72 F.3d 518, 521 (7th Cir. 1995).

- 24 -

For Akins' Eighth Amendment claims, Akins must show that it was clear, to someone in Defendants' position, that Defendants would violate Akins' constitutional rights by the manner they handled his requests to be seen in the HSU. For the reasons stated above, Akins can make no such showing. As such, they are entitled to immunity from Akins' suit.

## CONCLUSION

The defendants request that their Motion for Summary Judgment be GRANTED, and that this case be dismissed, with prejudice, in its entirety.

Dated this 18th day of March, 2016.

BRAD D. SCHIMEL
Wisconsin Attorney General

/s/Laure Rakvic-Farr

LAURE RAKVIC-FARR
Assistant Attorney General
State Bar #1049540

Attorneys for Defendants

Wisconsin Department of Justice
Post Office Box 7857
Madison, Wisconsin 53707-7857
(608) 266-0323
(608) 267-8906 (Fax)
rakvic-farrlc@doj.state.wi.us