IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

ARSENIO R. AKINS,

        Plaintiff,

v.                                    Case No. 15-cv-118-bbc

DOCTOR MAIER, SERGEANT KRASOVIC
and CORRECTIONS OFFICER RIBBKE,

        Defendants.

## DEFENDANTS' REPLIES TO PLAINTIFF'S RESPONSE TO DEFENDANTS' PROPOSED FINDINGS OF FACT

The defendants, by their attorneys, Brad D. Schimel, Wisconsin Attorney General, and Laure Rakvic-Farr, Assistant Attorney General, hereby submit the following replies to plaintiff's responses to defendants' proposed findings of fact in support of their motion for summary judgment.

**Parties**

1.    Arsenio Akins, #510691, has been housed at Columbia Correctional Institution (Columbia) since April 9, 2013.  (3/16/16 Hart Decl., ¶ 6.)

**RESPONSE:** No dispute.

    **REPLY: This fact is undisputed so no response is necessary.**

2.    Akins was allowed to proceed on claims that Officer Charles Ribbke and Sergeant Joseph Krasovec were deliberately indifferent to Akins' serious

medical need when they ignored his requests for medical assistance for his withdrawal symptoms and that they retaliated against him for filing grievances against them. (Opinion and Order ECF No. 9, p. 18.)

**RESPONSE:** No dispute.

> **REPLY: This fact is undisputed so no response is necessary.**

3.  Akins was also allowed to proceed on a claim that Dr. Gary Maier was deliberately indifferent to his serious medical need when on June 24, 2014, he abruptly stopped distributing Akins' medicine (Paroxetine) to him, rather than tapering him off the medication while waiting for his new prescription to arrive, which caused Akins to experience symptoms including chest pain, stomach cramps, memory loss, dizziness, nausea and migraine headaches. (Opinion and Order ECF No. 9, p. 2.)

**RESPONSE:** No dispute.

> **REPLY: This fact is undisputed so no response is necessary.**

4.  At all times relevant, Charles Ribbke was employed by the Wisconsin Department of Corrections (Corrections) as a correctional officer II at Columbia, located in Portage, Wisconsin. (3/16/16 Ribbke Decl., ¶ 2.)

**RESPONSE:** No dispute.

> **REPLY: This fact is undisputed so no response is necessary.**

5.  At all times relevant, Joseph Krasovec was employed by Corrections as a Sergeant at Columbia. (3/18/16 Krasovec Decl., ¶ 2.)

**RESPONSE:** No dispute.

**REPLY: This fact is undisputed so no response is necessary.**

6.     At all times relevant, Gary Maier, M.D. was employed by Corrections as the psychiatrist at Columbia. (3/17/16 Maier Decl., ¶ 2.)

**RESPONSE:** No dispute but affirmatively allege that Defendant Maier no longer works at or for CCI. (Akins Decl. ¶3)

**REPLY: No dispute.**

## Treatment of Arsenio Akins

7.     Dr. Maier first began treating Akins when he transferred to Columbia in April 2013. (Maier Decl., ¶ 10.)

**RESPONSE:** No dispute.

**REPLY: This fact is undisputed so no response is necessary.**

8.     Akins has a diagnosis of adjustment disorder with disturbance of mood/depression and a history of attention deficit/hyperactivity disorder (ADHD). Akins does not have a diagnosis of adult ADHD and during Dr. Maier's treatment of Akins, he never observed signs of adult ADHD. (Maier Decl., ¶ 11, Ex. 1000, pp. 1, 3, 5, 7, 9, 16.)

**RESPONSE:** No dispute that this accurately states that records from Akins' file. Akins affirmatively alleges he has symptoms of Adult ADHD, whether or not defendant Maier observed these symptoms. (Declaration of Arsenio R. Akins ("Akins Decl."), ¶ 4; Declaration of Jeffrey M. Davis, Jr., ¶4)

**REPLY:     The defendants OBJECT because the cited evidentiary material is an unqualified opinion from a witness**

**who does not have personal knowledge and to which no foundation has been established to render such an opinion. Neither Mr. Akins nor Mr. Davis are medical experts qualified to render an opinion regarding whether Akins exhibited symptoms of Adult ADHD.** *See* **Fed. R. Evid. 602 personal knowledge, 702 expert witnesses. Because Akins' cited evidentiary material does not dispute that Dr. Maier never observed signs of adult ADHD in Mr. Akins, that fact is undisputed.**

9. Dr. Maier first prescribed Paroxetine to Akins on February 19, 2014 after he reported that he stopped taking Venlafaxine (an antidepressant) that Dr. Maier had prescribed to help manage his depression because it was causing side effects. Akins was also taking Trazodone, which helped manage his sleep. (Maier Decl., ¶ 12, Ex. 1000, pp. 1-2.)

RESPONSE: No dispute.

**REPLY: This fact is undisputed so no response is necessary.**

10. Paroxetine is an antidepressant drug in the selective serotonin reuptake inhibitors class (SSRIs). Paroxetine is most commonly used to treat depression, obsessive-compulsive disorder, anxiety disorders and post-traumatic stress disorder. Venlafaxine is a selective serotonin norepinephrine inhibitor (SNRI) and because Akins reported this medication was not working for him, Dr. Maier switched him to an SSRI medication. (Maier Decl., ¶ 13.)

**RESPONSE:** No dispute.

**REPLY: This fact is undisputed so no response is necessary.**

11.     Dr. Maier explained the benefits and possible side effects of Paroxetine and he ordered a medication information sheet for him that would include the possible side effects. Dr. Maier discontinued the Venlafaxine because Akins reported that he had stopped taking it and because he replaced it with Paroxetine. Akins had no other complaints or issues to discuss at this appointment so Dr. Maier scheduled him for a follow-up in four weeks. (Maier Decl., ¶ 14, Ex. 1000, pp. 1-2.)

**RESPONSE:** Dispute that Dr. Maier did not explain the benefits and possible side effects of Paroxetine, Akins had to ask for the medication information sheet on this medication. Maier has a history of not providing this information prior to prescribing a medication unless the patient asks for it. (Akins Decl. ¶5).

> **REPLY: Disputed, but not material for the purpose of summary judgment.  Dr. Maier's alleged failure to provide side effect information did not cause the harm of which Mr. Akins complains in this lawsuit.  Mr. Akins alleges that he suffered from withdrawal symptoms as a result of Dr. Maier's alleged deliberate indifference and negligence.**

12.     Common side effects of Paroxetine can include vision changes; weakness, drowsiness and dizziness; sweating, anxiety and shaking; insomnia; loss of appetite; constipation; dry mouth; and impotence. (Maier Decl., ¶ 15.)

**RESPONSE:** No dispute.

> **REPLY: This fact is undisputed so no response is necessary.**

13.     When Dr. Maier prescribes a new medication to a patient, it typically takes 7-10 days for the medication to get to the institution. This is because the order goes through one of Corrections' central pharmacies, which is located at another institution. The pharmacist at the central pharmacy has to process the order and then the medication has to be sent to the institution. (Maier Decl., ¶ 16.)

> **RESPONSE:** No dispute. Akins affirmatively alleges that it regularly takes longer than 3-10 days to receive medication. (Akins Decl. ¶6; Davis Declaration ¶3).

> > **REPLY: Disputed, but not material for the purpose of summary judgment. Akins was without Paroxetine for 5 days before it was started again by the doctor on-call on June 29, 2014 after Mr. Akins complained of what he believed were withdrawal symptoms associated with the discontinuation of Paroxetine. (Maier Decl. ¶ 39.)**

14.     Dr. Maier's next appointment with Akins was on March 19, 2014 for a scheduled follow-up. Akins reported that he never received the medication information sheet for Paroxetine so he did not start taking the medication because he wanted to read the information first. Dr. Maier noted that Akins was concerned about medications and he felt that in the past, at times, he had been overdosed or

given the wrong medication, and therefore, he wanted to be cautious.  (Maier Decl., ¶ 17, Ex. 1000, pp. 3-4.)

**RESPONSE:** No dispute.

**REPLY: This fact is undisputed so no response is necessary.**

15.     Dr. Maier re-ordered the medication information sheet and a follow-up appointment in two weeks to discuss starting the Paroxetine. (Maier Decl., ¶ 18, Ex. 1000, pp. 3-4.)

**RESPONSE:** No dispute.

**REPLY: This fact is undisputed so no response is necessary.**

16.     Dr. Maier next saw Akins on April 2, 2014 at which time Akins reported he started taking the Paroxetine as prescribed and he tolerated it with no side effects. (Maier Decl., ¶ 19, Ex. 1000, pp. 5-6.)

**RESPONSE:** Dispute. Akins reported that the medication made him feel weird. Maier informed Akins that he should give it a few weeks and that the body must get used to the medication, but once his body got used to it, he should feel fine. (Akins Decl. ¶7).

**REPLY: Disputed.   But not material for the purpose of summary judgment.   Mr. Akins' claim is that Dr. Maier was deliberately indifferent and negligent when the doctor discontinued Paroxetine, which Mr. Akins believes caused withdrawal symptoms.**

17.    Akins had no other complaints or concerns to discuss at the April 2, 2014 appointment so Dr. Maier scheduled him for a follow-up in seven weeks. (Maier Decl., ¶ 20, Ex. 1000, pp. 5-6.)

RESPONSE: Dispute. Akins informed Maier that the medication was not changing the symptoms of depression that he felt. Maier informed Akins that he medication had to into his system and to give it a few more weeks. (Akins Decl. ¶8).

REPLY: Disputed.   But not material for the purpose of summary judgment.   Mr. Akins' claim is that Dr. Maier was deliberately indifferent and negligent when the doctor discontinued Paroxetine, which Mr. Akins believes caused withdrawal symptoms

18.    Dr. Maier next met with Akins on May 28, 2014 for a scheduled follow-up. Although he had been on Trazodone for months, Akins reported getting some headaches, which he believed to be from the Trazodone. Dr. Maier then described the benefits and side effects of diphenhydramine, which is an antihistamine that can be used to induce sleep. Akins reported that he thought he took this medication before his incarceration. (Maier Decl., ¶ 21, Ex. 1000, pp. 7-8.)

RESPONSE: Dispute. Akins never attributed the periodic headaches to the Trazodone. Symptoms from medications typically show up within 2-3 weeks of starting a medication. (Declaration of Gary Maier, Dkt. 36, ¶26 ("Maier Decl.")). At no time did Akins report that he thought he'd taken

Diphenhydramine before his incarceration. Akins complained of lingering drowsiness the day following his doses of Trazedone and that is when Maier suggested the Diphenhydramine. (Akins Decl. ¶9).

**REPLY: Disputed, but immaterial for the purpose of summary judgment.**

19.     At this appointment, Akins asked to have his medications moved to the evening instead of the morning during Ramadan. Dr. Maier had no issues with this and asked Akins to remind him to make the change closer to Ramadan. (Maier Decl., ¶ 22, Ex. 1000, pp. 7-8.)

**RESPONSE:** No dispute.

**REPLY: This fact is undisputed so no response is necessary.**

20.     Akins made no reports of any issues or concerns with the Paroxetine at the May 28, 2014 appointment. (Maier Decl., ¶ 23, Ex. 1000, pp. 7-8.)

**RESPONSE:** Dispute. Akins explained at the May 28, 2014 meeting that the Paroxetine didn't seem to be helping with the symptoms of his depression. He also explained to Maier that he did not like the weird feelings associated with Paroxetine. Maier acknowledged this, but side-stepped the issue, attributing the feeling Akins was experiencing to stress associated with his open criminal case and pending trial. Again, Maier states that Akins needed to give the medication more time. Maier increased Akins' Paroxetine previously on April 2, 2014. (Akins Decl. ¶ 10; Maier Decl., Ex. 1000, pp. 001-006).

**REPLY: Undisputed for the purpose of summary judgment.**

21.     Dr. Maier's next appointment with Akins was on June 24, 2014 for a scheduled follow-up. Akins reported he was taking the diphenhydramine and it worked, but it was giving him a stuffy nose. Akins decided to continue the diphenhydramine. (Maier Decl., ¶ 24, Ex. 1000, pp. 9-10.)

**RESPONSE:** No dispute.

> **REPLY: This fact is undisputed so no response is necessary.**

22.     Akins reported that he felt the Paroxetine that he had been on since March was causing him headaches.  Akins made no reports that he was having headaches from Paroxetine at his April or May appointments with Dr. Maier. (Maier Decl., ¶ 25, Ex. 1000, pp. 5-10.)

> **RESPONSE:** Dispute. Akins did not report that he believed the Paroxetine had caused him to have headaches at the June 24, 2014 appointment. Akins informed Maier that he knew the medication was for depression, but nothing about headaches. Akins did report a sickness he felt in his stomach. He and Maeir discussed the stress discussed associated with Akins' pending legal matters and trial that was approaching. (Akins Decl. ¶11).

> **REPLY: Undisputed for the purpose of summary judgment.**

23.     SSRI medications take 2-3 weeks to take effect. Typically, if a patient is going to experience a side effect from an SSRI medication, such as headaches, the side effect can occur within hours to days and/or after an increase in dosage. (Maier Decl., ¶ 26.)

**RESPONSE:** No dispute.

**REPLY: This fact is undisputed so no response is necessary.**

24.      Akins also reported that he did not feel the Paroxetine was helping him with his legal work. Dr. Maier explained to Akins that he was more concerned with whether the Paroxetine was helping him with his depression and anxiety, which it was prescribed. (Maier Decl., ¶ 27, Ex. 1000, pp. 9-10.)

**RESPONSE:** Dispute. Akins did not report to Maier that he did not feel the Paroxetine was helping him with his legal work. Akins informed Maier that he knew the medication was for treating the symptoms of his depression. (Akins Decl. ¶12).

**REPLY: Undisputed for the purpose of summary judgment.**

25.      Dr. Maier did not believe the Paroxetine was causing headaches, but upon further discussion with Akins, he agreed to discontinue the Paroxetine per Akins' request and switch him to another medication, Fluoxetine. Fluoxetine is another SSRI that is used to treat depression and anxiety with a different side effect profile. Dr. Maier explained the benefits and possible side effects of this medication. (Maier Decl., ¶ 28, Ex. 1000, pp. 9-10.)

**RESPONSE:** Dispute. Akins did not request to have the medication discontinued because of headaches, as this DPFOF implies. Akins disputes any implication that the medication was discontinued because Akins had headaches or that Maier believed Akins was complaining the medication caused headaches. Again, Maier did not explain the full benefits and side effects of the new medication he prescribed, Fluoxetine. He regularly failed to

fully explain these or provide full informed consent. It is the responsibility of the patient to request the medication information sheets on medications. These are not available during the appointments of inmates of CCI unless they are already prescribed the medication or a physician orders the sheets for them, typically. Akins only received the medication information sheets on Fluoxetine after he was prescribed it. (Akins Decl. ¶13)

> **REPLY: Disputed, but immaterial for the purpose of summary judgment. Mr. Akins does not dispute the fact that the medication was changed because Mr. Akins requested a change, so this particular fact remains undisputed.**

26.     Dr. Maier discontinued the Paroxetine on June 24, 2014 because Akins reported it was not helping him and it was causing him headaches. The only way to alleviate side effects from a medication is to discontinue the medication; tapering off the medication would not relieve the patient from their reported side effects. (Maier Decl., ¶ 29, Ex. 1000, pp. 9-10.)

> **RESPONSE:** Dispute. Akins had not specifically stated the Paroxetine caused him headaches and that it should be discontinued. Akins informed Maier the medication made him feel sick and that he was willing to try another medication. Further, he informed Maier that the medication was not helpful. Plaintiff further disputes that the only way to alleviate side effects from a medication to discontinue it. At face value this is illogical. Maier

advised Akins of the side effects of abruptly stopping Paroxetine after he'd suffered from withdrawals. (Akins Decl. ¶ 14 ).

> **REPLY: The following statements are accepted as undisputed for the purpose of summary judgment: Mr. Akins' statements that he told Dr. Maier the medication made him feel sick and that he was willing to try another medication; and Mr. Akins' statement that he informed Dr. Maier that the medication was not helpful. Mr. Akins' dispute with Dr. Maier's statement that the only way to alleviate side effects is to discontinue the medication should be disregarded by the Court. Mr. Akins cites only his own declaration in support this statement, which is objectionable because it is an unqualified opinion from a witness who does not have the foundation upon which to opine. Mr. Akins does not have any medical training or expertise and cannot offer expert opinions regarding the cause of side effects. *See* Fed. R. Evid. 702.**

27.    The decision to taper someone off of an SSRI medication is made by the treating psychiatrist and it is done on a case-by-case basis depending on the patient, the medication, the dosage and the length of time the patient has been on the medication. (Maier Decl., ¶ 30.)

> **RESPONSE:** No dispute, but affirmatively allege that a patient taking Paroxetine should be tapered off. (Akins Decl. ¶15).

**REPLY:** The defendants **OBJECT** because the cited evidentiary material is an unqualified opinion from a witness who does not have personal knowledge and to which no foundation has been established to render such an opinion. *See* Fed. R. 702. Mr. Akins does not have any medical training or expertise and cannot offer expert opinions regarding the cause of side effects. *See* Fed. R. Evid. 702.

28. Based on Akins' report that the medication was providing him with no benefits and that it was causing him to have headaches, along with his underlying concerns about medications and their side effects, Dr. Maier chose to discontinue the Paroxetine without tapering him off of it because it was the best way to alleviate the side effects that Akins was so unhappy with. Dr. Maier also expected the Fluoxetine to start in a timely fashion and for there to be some Paroextine still in his system until the Fluoxetine started. (Maier Decl., ¶ 31, Ex. 1000, pp. 9-10.)

**RESPONSE:** Dispute. Akins did not report that his headaches were caused by Paroxetine. Akins was working with the CCI medical doctor treat his headaches, he sought treatment from Maier to treat his mental health and psychiatric conditions. Akins was not concerned about medication or it's side effects in a manner which he thought warranted requesting the abrupt stoppage of his medication. Akins informed Maier that he was unable to deal with was the sick feeling in his stomach. Maier agreed to change the new prescription for his depression to Fluoxetine. It is widely known in CCI that

medication lapses and delays are frequent, particularly so when new medication is ordered. (Akins Decl. ¶16; Davis Decl. ¶3)

**REPLY: Undisputed for the purpose of summary judgment.**

29.    Common withdrawal symptoms from SSRI's can be headaches, gastrointestinal distress, faintness and strange sensations of vision or touch that are transient and usually resolved within days. None of these side effects are life threatening. (Maier Decl., ¶ 32.)

RESPONSE: No dispute.

**REPLY: This fact is undisputed so no response is necessary.**

30.    The risk of suffering from withdrawal symptoms, such as headaches, did not outweigh the benefits of tapering off the medication since the medication was already self-reportedly causing headaches and not providing any positive results. (Maier Decl., ¶ 33.)

RESPONSE: Dispute. Akins suffered periodic headaches prior to the discontinuation of the Paroxetine, he suffered migraines afterward. The migraines were a consequence suffered after the abrupt discontinuation of Paroxetine. (Akins Decl. ¶ 17; Maier Decl., Ex. 1000-011).

**REPLY: The defendants OBJECT because the cited evidentiary material is an unqualified opinion from a witness who does not have personal knowledge and to which no foundation has been established to render such an opinion. *See* Fed. R. Evid. 702. Mr. Akins is not a medical professional and does not have the**

**expertise to testify that the migraines he allegedly suffered were caused by the discontinuation of the Paroxetine.**

31.     Further, Akins discontinued the Venlafaxine without medical consultation and without tapering off of it, and apparently did not experience withdrawal symptoms. This appeared to be a good clinical indicator that Akins would likely not experience any withdrawal symptoms from discontinuing Paroxetine. (Maier Decl., ¶ 34.)

RESPONSE: Object and Dispute. Akins tapered himself off of the Venlafaxine but only after he was told to do so from medical staff at Racine County Jail. Later, Maier instructed Akins not to do this anymore without first contacting Maier. Akins did suffer some withdrawal symptoms from the Venlafaxine, which is why he was tapering himself off of it. He did not have the opportunity with the Paroxetine because Maier stopped the medication abruptly. Object on the basis that plaintiff was denied an expert by this Court (Dkt. 29-30), an expert that would have testified that the discontinuation of the Venlafaxine was not relative to the decision to abruptly discontinue the Paroxetine abruptly. (Akins Decl. ¶ 18).

**REPLY: The defendants OBJECT because the cited evidentiary material (Mr. Akins' statement regarding Racine County Jail staff and Akins' statement regarding what an expert may testify to) is inadmissible hearsay pursuant to Fed. R. Evid. 802.   The defendants OBJECT to Mr. Akins' statement that he**

**suffered withdrawal symptoms from the Venlafaxine because Akins does not have the expertise or foundation to offer this opinion.**

32.    Dr. Maier next saw Akins on July 10, 2014 at which time Akins reported he was experiencing what he thought was medication withdrawal when he was taken off Paroxetine and the Fluoxetine did not start immediately. (Maier Decl., ¶ 35, Ex. 1000, pp. 15-16.)

RESPONSE: Maier only saw Akins because of his multiple complaints and the request of CCI staff. Akins submitted multiple request forms and requested to be seen about the withdrawal symptoms he was experiencing. This DPFOF implies Maier elected to see Akins, he disputes that, as it was not the case. Akins described to Maier the symptoms of withdrawal that he was experiencing. Maier reviewed the inmate complaint Akins filed while he met with Akins. Maier did not see Akins until he filed the formal inmate complaint. (Akins Decl. ¶ 19, Ex._).

**REPLY: The plaintiff's response does not sufficiently dispute this proposed finding of fact; therefore, this proposed finding of fact should be deemed undisputed pursuant to Fed. R. Civ. P. 56(e). As to the plaintiff's additional assertions, the defendants OBJECT because the plaintiff's assertions are conclusory and argumentative and, therefore, should be disregarded by the court.**

33.     The Fluoxetine did not start immediately because when Dr. Maier prescribes a new medication, the order has to be approved by a Corrections central pharmacist, processed by the pharmacy and sent to the institution. The Fluoxetine order was received at Columbia on July 3, 2014. (Maier Decl., ¶ 36, Ex. 1000, p. 18.)

RESPONSE: No dispute, but affirmatively allege that Maier was aware of the delay Akins would certainly suffer, when Maier prescribed the Fluoxetine. (Akins Decl. ¶20).

REPLY: The plaintiff's response does not sufficiently dispute this proposed finding of fact; therefore, this proposed finding of fact should be deemed undisputed pursuant to Fed. R. Civ. P. 56(e) As to the plaintiff's additional assertions, defendants OBJECT because Mr. Akins does not have the foundation or expertise to opine that he would "suffer" due to Dr. Maier's actions, or that Dr. Maier knew that Akins would suffer.

34.     While it is possible to order a medication "STAT" (on-demand), which would get the medication to the institution within 24 hours, it is not common practice to do so for antidepressants. Also, the fact that Akins willingly self-discontinued the Venlafaxine without medical consult or any apparent withdrawal symptoms, showed that Akins was willing to be un-medicated for a period of time. (Maier Decl., ¶ 37.)

RESPONSE: Dispute. Akins did not willingly discontinue on his own the

Venlafaxine, rather he had a medical consult from medical [professionals at the county jail he has then housed in. (Akins Decl. ¶ 18).

> **REPLY: The plaintiff's response does not sufficiently dispute this proposed finding of fact; therefore, this proposed finding of fact should be deemed undisputed pursuant to Fed. R. Civ. P. 56(e). Further, Mr. Akins' reference to statements made by Racine County Jail staff (contained in ¶ 18 of his declaration) is inadmissible hearsay and should be disregarded by the Court.**

35.   Further, since Dr. Maier was prescribing these medications to improve Akins' mood and by Akins' report, to improve his ability to work on his legal work, there was no serious clinical condition requiring "STAT" treatment. (Maier Decl., ¶ 38.)

> **RESPONSE:** Dispute. The prescriptions Maier wrote for medications was not to help with Akins with legal work - Maier will not prescribe medication to aid inmates with legal work. Further, the implication that a STAT medication order was only required for a serious clinical condition is disputed, a STAT order was also appropriate where it would prevent a serious medical or clinical condition as well. (Akins Decl. ¶21).

> > **REPLY: Undisputed that Dr. Maier will not prescribe medication to aid inmates with legal work, but the statement in this proposed finding of fact is that the medication was**

prescribed to improve Mr. Akins' mood.  Mr. Akins does not dispute this fact and it should be accepted as undisputed. Defendants object to Mr. Akins' statement regarding the appropriate circumstances for a STAT order because Mr. Akins is not a medical professional and is not qualified to render expert opinion testimony. Notwithstanding this objection, Defendants accept Mr. Akins' statement regarding STAT orders as undisputed for the purpose of summary judgment.

36.    Dr. Maier's review of Akins' record shows that five days after the Paroxetine was discontinued, a nurse examined Akins and thought there would be psychological help to reinstate the Paroxetine pending the start of Fluoxetine, so she called the on-call physician, who ordered a re-start of Paroxetine until the Fluoxetine was received. At this appointment, Akins' vital signs were normal and the nursing diagnosis was "alteration in comfort." (Maier Decl., ¶ 39, Ex. 1000, pp. 11-13.)

RESPONSE: Dispute. The nurse was actually a man, Joe Reda, RN, not a 'she.' (Maier Decl. ¶ 39, Ex. 1000-013). Further, this DPFOF and supporting documentation exemplifies more than the alteration in comfort alleged, it shows the medical conditions that required physician intervention to correct the withdrawal symptoms Akins suffered from as a result of the Paroxetine being abruptly stopped. (Akins Decl. ¶ 22).

> **REPLY: The defendants OBJECT because the plaintiff's assertion is conclusory and argumentative and, therefore, it should be disregarded by the court. Defendants affirmatively state that the medical record speaks for itself.**

37.   Akins started taking the Fluoxetine on or about July 3, 2010[1]. At the July 10, 2014 appointment, Akins reported that he did not think the Fluoxetine was working. Because Fluoxetine is an SSRI, it would take 2-3 weeks to take effect. This report from Akins was an indication to Dr. Maier that Akins was not giving the medication a chance to work and he was seeking other medications. (Maier Decl., ¶ 40, Ex. 1000, pp. 15-16, 18.)

> **RESPONSE:** Dispute. Akins actually questioned the medications' efficacy because he no longer trusted Dr. Maier after the erroneous and abrupt stoppage of the Paroxetine and consequential withdrawal symptoms he endured as a result. Akins consequently sought pharmacological assistance to treat the symptoms of his mental illness and actively pursued a combination of psychology and psychiatry that would work best for him. (Akins Decl. ¶ 23).

> **REPLY: The defendants OBJECT because the plaintiff's assertion is conclusory and argumentative and, therefore, it should be disregarded by the court. Further, Akins' statements regarding the efficacy of the medication and alleged withdrawal symptoms are unqualified opinions by a witness**

---

[1] This is a typo and should read July 3, 2014.

with no medical knowledge or expertise. As such, they should be disregarded by the Court.

38.   Dr. Maier agreed to discontinue the Fluoxetine at Akins' request and to start him on Klonopin. Klonopin is a benzodiazepine used to treat anxiety and panic disorders. (Maier Decl., ¶ 41, Ex. 1000, pp. 15-16.)

RESPONSE: Dispute. Akins did not request Klonopin, though, it was at Maier's recommendation that Akins try the Klonopin. (Akins Decl. ¶ 24).

REPLY: The plaintiff's response does not sufficiently dispute this proposed finding of fact; therefore, this proposed finding of fact should be deemed undisputed pursuant to Fed. R. Civ. P. 56(e). Although Mr. Akins disputes that he requested Klonopin, he did not dispute that he wished to discontinue the Fluoxetine. This fact should therefore be accepted as undisputed. Even if it is disputed, however, any dispute is immaterial for the purpose of summary judgment.

39.   Dr. Maier noted that Akins' migraine headaches were being addressed by his medical doctor, which led him to believe that his migraine headaches were not caused by the Paroxetine. And therefore, Dr. Maier thought Akins' complaints of migraine headaches as a withdrawal symptom was more in question. (Maier Decl., ¶ 42, Ex. 1000, pp. 15-16.)

RESPONSE: Object and dispute. The migraines were a symptom of the withdrawals, and only began after the abrupt stoppage of the Paroxetine. The

headaches he suffered periodically prior to the abrupt stoppage of the Paroxetine were not the same in location, severity or duration. The plaintiff objects to this DPFOF on the basis Maier's thoughts of Akins' complaints of migraine headaches as a withdrawal symptom being in question on the basis that this is not a proposed fact, but a supposition, and not admissible evidence. Akins' migraine headaches warranted a physician to restart the Paroxetine to stop them as he thought they were symptoms of the abrupt stoppage. (Akins Decl. ¶ 25; Maier Decl., Maier Decl. Ex. 1000-010).

> **REPLY: The Defendants object because Mr. Akins has no medical knowledge, expertise or foundation to offer expert opinions regarding diagnoses, withdrawal symptoms, or causation.  Mr. Akins did not sufficiently dispute the following fact, which should be accepted by the court as undisputed: Akins' migraine headaches were being addressed by his medical doctor.**

40.     Also, the fact that Akins was frequently requesting new medications, specially medications that would help him with his mood and his legal work, led Dr. Maier to believe he was seeking other drugs, such as Adderall. Adderall is a psychostimulant used to treat ADHD.  Adderall is a drug of abuse in prison, where inmates snort it to get high or sell it to make a profit, and therefore, it requires careful monitoring. In Akins' case, he was found almost immediately to be abusing it and it was ultimately discontinued for abuse. Dr. Maier never observed signs of

adult ADHD during my appointments with Akins. (Maier Decl., ¶ 43, Ex. 1000, pp. 1, 3, 5, 7, 9, 16, 19-21.)

> **RESPONSE:** Object and dispute. Akins never stated these mood and depression issues in an effort to seek any specific medication, rather he allowed Maier to dictate the course of treatment and only informed Maier of the effects of each medication as well as any side effects he experienced. Object on the basis that Maier's speculative assertion that Akins was a drug-seeking for profit or abuse is not based on fact, and thus is not admissible evidence. (Akins Decl. ¶ 26).

> > **REPLY: The plaintiff's response does not sufficiently dispute the following proposed findings of fact; therefore, the following finding of fact should be deemed undisputed pursuant to Fed. R. Civ. P. 56(e): Adderall is a drug of abuse in prison and requires careful monitoring. Akins' was found to be abusing Adderall while in prison and it was discontinued because of this abuse.**

41.   As Akins' psychiatrist, Dr. Maier deliberately saw him on a frequent basis and was very attentive to him. Dr. Maier listened to his concerns about medications and gave him alternative choices. Akins agreed with Dr. Maier's treatment plans and at no point did my treatment cause him significant or life-threatening side effects. (Maier Decl., ¶ 44.)

- 24 -

**RESPONSE:** Dispute. Maier failed to listen to Akins' concerns. He proposed treatment that Akins agreed to only after a CCI nurse became part of the picture, as he trusted the nurse. She explained things to Akins before he accepted any treatment Maier proposed. Akins lost trust in Maier after the abrupt stoppage and consequential withdrawal symptoms he suffered. Dispute that this DPOFOF implies Maier provided Akins with recommendations for medication. Akins listened to the things Maier and the RN who partook in these meeting said, regarding medication and allowed the physician to dictate the treatment Akins received. (Akins Decl. ¶ 27).

> **REPLY: The defendants OBJECT to Mr. Akins' statements regarding the nurse because it constitutes inadmissible hearsay pursuant to Fed. R. Evid. 802.  The balance of Mr. Akins' response does not sufficiently dispute the proposed finding of fact; therefore, this proposed finding of fact should be deemed undisputed pursuant to Fed. R. Civ. P. 56(e).**

## Akins' Complaints to Ribbke and Krasovec

42.     On June 29, 2014, Krasovec was assigned as the sergeant on housing unit 4 during first shift, which is between 6:00 a.m. – 2:00 p.m. At approximately 11:00 a.m., Akins came into the dayroom as staff was closing the dayroom and locking down the unit for count and lunch. The unit cell doors are unlocked during dayroom, recreation and lunch allowing the inmates to leave and return to their

cells as necessary. Once an inmate returns to their cell, they are to close their cell door to "lock in."  (Krasovec Decl., ¶ 5, Ex. 1005, p. 2.)

> **RESPONSE:** Dispute on the basis that the unit cell doors are not unlocked during dayroom, recreation and lunch and that inmates are not allowed to leave and return to their cells until the sergeant opens the tier door and their cell door. When an inmate enters the dayroom for dayroom time or for a meal, he is locked in the dayroom. When he goes to recreation, the cell doors are locked and secured. Anytime an inmate is out of their cell, they are required by rule and policy to lock their cell door. Also, plaintiff disputes that the dayroom for every unit ends at 10:45 am, not 11:00 am. Object on the basis that defendants have relied on a sham affidavit to support this DPFOF. Krasovic Deel. ¶¶ 5 and 19 are starkly contradictory.
>
> (Akins Decl. ¶ 28; Lewis Decl., ¶ 3; Krasovec ¶¶ 5 & 19).

> > **REPLY: Dispute that the Krasovec declaration is contradictory, and affirmatively allege that the declaration speaks for itself.  The balance of Mr. Akins' response is undisputed for the purpose of summary judgment.**

43.   Akins was not authorized to be in the dayroom at this time. Akins reported that he was not feeling well and that he was dizzy and lightheaded. In response, Krasovec contacted the Health Services Unit, reported Akins' symptoms as he reported them to Krasovec, and the Health Services Unit determined that the symptoms were not an emergency. As such, they advised Akins to drink fluids and

rest. Krasovec relied on the medical judgment of the Health Services unit staff. (Krasovec Decl., ¶ 6, Ex. 1005, pp. 2, 12)

> **RESPONSE:** Dispute on the basis that Krasovec downplayed Akins' symptoms and that Krasovec was not supposed to be participating in the triage of an inmate's medical condition. Krasovec prevented Akins from obtaining medical treatment at that time by not relaying the actual symptoms Akins was having. Akins described conditions that indicated an emergent, or at least an urgent conditions which required medical intervention. Krasovec misinformed the nurse that Akins had gone to recreation when in fact, Akins had not gone to recreation because he was feeling ill. (Akins Decl. ¶ 29).

> > **REPLY: Mr. Akins' response does not dispute that Krasovec contacted the Health Services Unit, so the Court should accept this fact as undisputed. Regarding the balance of Akins' response, Defendants dispute, but any dispute is immaterial for the purpose of summary judgment.**

44.    Akins alleges that at about 11:00 a.m., he asked Ribbke to contact the Health Services Unit because he was feeling dizzy. Ribbke does not recall Akins asking him to call the health services unit, but his normal practice is to note the inmate's concerns and contact the health services unit for guidance. If Akins had reported concerns to Ribbke, Ribbke would have contacted the health services unit. (Ribbke Decl., ¶ 5.)

**RESPONSE:** Object and dispute. Object on the basis that Ribbke cannot assert the probably response he would have taken based on his normal practices. Akins did contact Ribbke at 1000 am and Ribbke failed to contact HSU. The fact that Ribbke does not recall does not mean that it did not happen, only that he failed to recall. Akins clearly recalls being so ill that he requested that he call HSU. (Akins Decl. ¶ 30).

**REPLY: Akins' objections to Ribbke's statement concerning his regular practice is unfounded and should be ignored by the court. The balance of Akins' response is undisputed for the purpose of summary judgment.**

45.    The housing unit 4's logbook shows that at 11:10 a.m. on June 29, 2014, someone on the unit contacted the health services unit on behalf of Akins and nursing staff advised that Akins drink more fluids and rest. (Ribbke Decl., ¶ 6; Ex. 1005, p. 12.)

**RESPONSE:** Object and dispute. Object on the basis this DPFOF is supported only by hearsay. Neither Ribbke nor Krasovec have introduced admissible testimony or evidence that they called HSU and received this information at this time, there is no corroborating evidence to support this proposed fact. Plaintiff disputes that Hsu was actually contacted and that nursing staff advised that Akins drink more fluids and rest based on the fact that this DPFOF is unsupported by admissible evidence. (Akins Decl. ¶ 31 ).

**REPLY: The plaintiff's response does not sufficiently dispute this proposed finding of fact; therefore, this proposed finding of fact should be deemed undisputed pursuant to Fed. R. Civ. P. 56(e). The logbook is a business record admissible pursuant to Fed. R. Evid. 803 (6).**

46.    Ribbke's and Krasovec's shift ended at 2:00 p.m. at which time they left the institution. (Ribbke Decl., ¶ 7; Krasovec Decl., ¶ 11.)

**RESPONSE:** No dispute.

**REPLY: This fact is undisputed so no response is necessary.**

47.    According to Akins' medical record, Akins was seen by the Health Services Unit at 4:50 p.m. on June 29, 2014. At that time, Akins reported chest pain, inability to sleep and dizziness. (Ribbke Decl., ¶ 8; Krasovec Decl., ¶ 12; Maier Decl., Ex. 1000, pp. 12-13.)

**RESPONSE:** Object. Object on the basis this DPFOF is supported only by hearsay. To proffer that Akins was actually seen and reported these things is inadmissible based on the cited evidence. Neither Krasovec, Ribbke nor Maier testified they personally witnessed these alleged events..

**REPLY: The plaintiff's response does not sufficiently dispute this proposed finding of fact; therefore, this proposed finding of fact should be deemed undisputed pursuant to Fed. R. Civ. P. 56(e).   The cited records are from Mr. Akins' certified medical record that was transmitted to the Department of**

Justice after Mr. Akins commenced this lawsuit and are admissible pursuant to Fed. R. Evid. 803(6).

48.     At no time on June 29, 2014 did Ribbke or Krasovec believe that Akins was suffering from a life-threatening condition such that emergency treatment was necessary. (Ribbke Decl., ¶ 9; Krasovec Decl., ¶ 7.)

RESPONSE: No dispute.

**REPLY: This fact is undisputed so no response is necessary.**

49.     Although Akins reported that he was lightheaded and dizzy, he was able to walk without difficulty into the dayroom and appeared normal. (Krasovec Decl., ¶ 8.)

RESPONSE: Dispute. While Akins does not dispute that Akins reported that he was light headed and dizzy, he disputes that Akins was able to walk without difficulty in to the dayroom. Also dispute that he appeared normal. Krasovec failed to testify in his declaration that Akins ever walked in a similar fashion so as to define what normal would be for Akins. Without something establishing that Krasovec knew the 'normal' gait and ease of mobility of walking that Akins moved with, he cannot testify to the normalcy or difficulty with which Akins walked at this time. (Akins Decl. ¶ 31; Lewis Decl., ¶ 4).

**REPLY: The plaintiff's response does not sufficiently dispute this proposed finding of fact; therefore, this proposed finding**

of fact should be deemed undisputed pursuant to Fed. R. Civ. P. 56(e).

50.    If Ribbke or Krasovec thought Akins had an emergency condition, they would have contacted the Health Services Unit and requested assistance on the unit, or arranged for Akins' immediate transfer to the Health Services Unit. (Ribbke Decl., ¶ 10; Krasovec Decl., ¶ 9.)

> **RESPONSE:** No dispute that this is what Ribbke and Krasovec should have done in this situation.
>
> **REPLY: This fact is undisputed so no response is necessary.**

51.    As a member of the security staff, Krasovec is not trained to conduct physical examinations, and he relies on the trained medical staff at the prison for determining when an inmate needs urgent medical care. (Krasovec Decl., ¶ 10.)

> **RESPONSE:** No dispute.
>
> **REPLY: This fact is undisputed so no response is necessary.**

52.    On June 30, 2014, Akins filed offender complaint No. CCI-2014-12680 in which he alleged that Ribbke and Krasovec refused him medical care on June 29, 2014. The institution complaint examiner, Lucas Wogernese, interviewed Krasovec regarding this complaint. At that time, Krasovec reported to Mr. Wogernese what he had witnessed on June 29, 2014, which is detailed at paragraphs 42-43 above. (Krasovec Decl., ¶ 13, Ex. 1005, p. 2.)

> **RESPONSE:** Object and dispute as to the extent that Wogemese would not have revealed the complaint number, when Akins filed the complaint or any

information regarding the complaint. The only information he would have disseminated to Ribbke or Krasovec would have been that which was absolutely required to investigate the complaint. (See DOC Adm. Code Ch. 310.16(1)).

> **REPLY: The plaintiff's response does not sufficiently dispute this proposed finding of fact; therefore, this proposed finding of fact should be deemed undisputed pursuant to Fed. R. Civ. P. 56(e). Any dispute is immaterial for the purpose of summary judgment.**

53.    Until this lawsuit, Ribbke was not aware that Akins filed offender complaint CCI-2014-12680 alleging that unit staff denied him to go to HSU on June 29, 2014. Ribbke was not contacted about this offender complaint. (Ribbke Decl., ¶ 11.)

> **RESPONSE:** Dispute. Each time that Akins had an issue with either Krasovec or Ribbke, he would boldly go to the area of the dayroom where the forms are kept and take the complaint forms. Akins discussed the inmate complaints with Ribbke and Krasovec before he filed them. He is required to do so as a part of the inmate complaint process, he must attempt to informally resolve the complaint using the chain of command. (DOC Adm Code Ch. 310.09(4)). He continued contacting both Ribbke and Krasovec about his gripes he had with each of them until he suffered and feared additional retaliation from them. (Akins Decl. ¶ 32; Lewis Deel. ¶ 5).

**REPLY: The plaintiff's response does not sufficiently dispute this proposed finding of fact; therefore, this proposed finding of fact should be deemed undisputed pursuant to Fed. R. Civ. P. 56(e). DOC 310.09(4) expressly states that the complaint examiner "may direct the inmate to attempt to resolve the issue," and does not impose upon the inmate an obligation to resolve the complaint prior to filing a formal complaint. Any dispute is immaterial for the purpose of summary judgment.**

54.     Until this lawsuit, neither Krasovec nor Ribbke were aware that Akins filed offender complaint No. CCI-2014-13730 in which he alleged that Krasovec gave the Health Services Unit false information on June 29, 2014.  Neither Krasovec nor Ribbke were contacted about this offender complaint. (Krasovec Decl., ¶ 24, Ex. 1007; Ribbke Decl., ¶ 12.)

**RESPONSE:** Dispute. Akins contacted Ribbke and Krasovec as a matter of policy regarding this complaint before he filed it so that the ICE would not return his complaint for failure to follow the chain of command requirement. (Akins Decl. ¶ 33).

**REPLY: Disputed. See Defendants' Reply to Fact No. 53.**

55.     Ribbke was not aware that on July 6, 2014, Akins received another inmate's medication. Ribbke was not on duty when this occurred and it was not reported to him. (Ribbke Decl., ¶ 13.)

**RESPONSE:** Dispute. Akins contacted Ribbke on July 7, 2014 regarding the symptoms he experienced as a result of the previous days' improper medication administration by officer Dylan Maier. Akins asked Ribbke to contact HSU about this, but Ribbke refused. (Akins Decl. ¶ 34; Lewis Decl. ¶ 7).

> **REPLY: Disputed, but immaterial for the purpose of summary judgment.**

56.     On July 7, 2014, Ribbke was assigned as a correctional officer on housing unit 4 during first shift. Akins alleges that he told Ribbke to call the Health Services Unit because he was feeling dizzy and that he ignored him. Again, Ribbke does not recall Akins asking him to call the health services unit, but had Akins reported concerns to him, he would have contacted the health services unit. (Ribbke Decl., ¶ 14.)

**RESPONSE:** Object and dispute. See PRDPFOF ¶44, supra.

> **REPLY: See Defendant's Reply to Fact No. 44.**

57.     On Monday, July 7, 2014, at approximately 11:40 a.m., Akins approached Krasovec at the officer's desk and requested to be sent to the Health Services Unit immediately because he felt light headed. Akins appeared normal, and spoke in a demanding and loud voice. (Krasovec Decl., ¶ 14.)

**RESPONSE:** Dispute. Akins was not loud or demanding. He clearly asked Krasovec to please call HSU and Krasovec said, "not this again, I don't want

to deal with this every week." Akins informed him that this was not the same issue. (Akins Decl.¶ 35; Lewis Decl. ¶8; Glover Decl., ¶ 4).

> **REPLY: Objection.   The Glover declaration is unsigned and must be disregarded.  The balance of Mr. Akins' response is disputed but immaterial for the purpose of summary judgment.**

58.    In response to Akins' report of light-headedness, Krasovec attempted to contact the Health Services Unit via telephone, but the line was busy.  Krasovec told Akins to return to his cell and he would continue to contact the Health Services Unit.  In response, Akins became argumentative and stated, "You are refusing me medical attention."  Krasovec gave Akins three direct, verbal orders for Akins to return to his cell, and after the third order, Akins complied.  (Krasovec Decl., ¶ 15, Ex. 1003.)

> **RESPONSE:** Dispute. Krasovec did not give Akins three verbal orders to return to his cell. Plaintiff does not dispute that he complied with the directive to return to his cell or that he requested medical attention from Krasovec. (Akins Decl. ¶ 36; Lewis Decl. ¶ 8; Glover Decl., ¶5).

> **REPLY: Objection.   The Glover declaration is unsigned and must be disregarded.  Further, the plaintiff's response does not sufficiently dispute the following proposed findings of fact; therefore, the following proposed findings of fact should be deemed undisputed pursuant to Fed. R. Civ. P. 56(e):  Krasovec attempted to contact the Health Services Unit via telephone,**

- 35 -

but the line was busy.  Krasovec told Akins to return to his cell

and he would continue to contact the Health Services Unit.

59.     Akins' behavior got the attention of several inmates who were in the

dayroom for lunch, it was disruptive, and it slowed the noon medications pass on

the unit.  After Akins returned to his cell, Krasovec noticed that the unit panel light

showed that his door was not closed and secured.  Krasovec went to his cell and told

him that he needs to keep his door secured.  In response, he slammed the door shut.

(Krasovec Decl., ¶ 16, Ex. 1003.)

RESPONSE: Object and dispute.  Akins' behavior did not garner the

attention of other inmates.  Krasovec's denial of Akins' request for medical

attention may have done so, but Akins' behavior did not.  Absent testimony

from these other alleged inmates, Akins objects on the basis that this is

inadmissible hearsay evidence.  Further dispute that Krasovec informed that

Akins needed to keep his door secured and that Akins ever slammed his door.

(Akins Decl. ¶ 37; Lewis Decl. ¶ 9; Glover Decl., ¶ 6).

REPLY: Objection. The Glover declaration is unsigned and

must be disregarded. Further, the plaintiff's response does not

sufficiently dispute the following proposed findings of fact;

therefore, the following proposed findings of fact should be

deemed undisputed pursuant to Fed. R. Civ. P. 56(e):    The

incident slowed the noon medication pass and the incident

caught the attention of other inmates.  Mr. Akins' remaining

responses are disputed but immaterial for the purpose of summary judgment.

60.     According to Akins' medical record, he was seen by the Health Services Unit at 12:05 p.m. on July 7, 2014. (Krasovec Decl., ¶ 17; Maier Decl., Ex. 1000, p. 14.)

**RESPONSE:** No dispute that the medical record may reflect this.

**REPLY: This fact is undisputed, so no further reply is necessary.**

61.     Krasovec wrote Akins conduct report 2386693 in which he alleged that Akins violated Wis. Admin. Code § DOC 303.24[2] – Disobeying Orders; 303.28 – Disruptive Conduct; and 303.63 – Violations of Institution Policies, because of his behavior as described in my report and for no other reason.  Akins' behavior on July 7, 2014 posed a threat to the security of the prison and violated institution policies and procedures. (Krasovec Decl., ¶ 18.)

**RESPONSE:** Dispute. Akins disputes that the motive for writing this was retaliation. Akins did not violate DOC 303.24, 303.28 or 303.63 and he disputes the allegations in the conduct report as described in PRDPFOF ~ 59. Dispute that Akins' behavior on July 7, 2014 posed a threat to the security of the prison and violated no institution policy or procedure. (Akins Decl. ¶ 38; Lewis Deel. ¶ 10; Glover Decl., ¶ 7).

---

[2] At all times relevant, Wis. Admin. Code § DOC 303.24 was titled "Disobeying orders; DOC 303.28 was titled, "Disruptive conduct;" and DOC 303.63 was titled, "Violations of institution policies and procedures." These codes have been renumbered to Wis. Admin. Code § DOC 303.28 – Disobeying Orders and DOC 303.33 – Disruptive Conduct. Wis. Admin. Code § DOC 303.63 - Violations of Institution Policies no longer exists and its closest equivalent is DOC 303.28 – Disobeying Orders.

**REPLY: Objection. The Glover declaration is unsigned and must be disregarded. After a disciplinary hearing, Akins was found guilty of 303.24 & 303.63. (Pl's Resp. Defs' PFOF, ¶ 64.)**

62.    Columbia is a maximum-security institution and while housing unit 4 is considered general population, it is still a maximum security unit, which means that cell doors must be closed and secured except when inmates are entering/leaving their cells. (Krasovec Decl., ¶ 19.)

RESPONSE: Object and dispute. Object on the basis that this DPFOF relies on a sham affidavit to establish this proposed fact. Krasovec Decl. ¶5 starkly contradicts the facts he has asserted in ¶ 19 of his declaration, that the doors must be closed and secured except when inmates are entering/leaving their cells. In ¶5 he testified that the "unit cell doors are unlocked during dayroom, recreation and lunch allowing the inmates to leave and return to their cell as necessary." Dispute the implication that Krasovec holds inmates to maintaining their cell doors in a secure fashion consistently or constantly. (Atkins Decl. ¶39).

**REPLY: Disputed but immaterial for the purpose of summary judgment.**

63.    It is dangerous for inmates to be disruptive in front of other inmates because it may lead to other inmates becoming disruptive posing a security risk to staff and inmates. (Krasovec Decl., ¶ 20.)

RESPONSE: No dispute.

**REPLY: This fact is undisputed so no response is necessary.**

64.     After a disciplinary hearing for conduct report 2386693, Akins was found guilty of violating Wis. Admin. Code § DOC 303.24 and 303.63 and he received a disposition of 10 days loss of recreation and dayroom.  (Krasovec Decl., ¶ 21.)

**RESPONSE:** No dispute.

**REPLY: This fact is undisputed so no response is necessary.**

65.     According to Akins' medical record, he was seen by the Health Services Unit at 12:05 p.m. on July 7, 2014. At that time, Akins reported dizziness and psychological issues including paranoid feelings. (Ribbke Decl., ¶ 15; Maier Decl., Ex. 1000, p. 14.)

**RESPONSE:** No dispute.

**REPLY: This fact is undisputed so no response is necessary.**

66.     At no time on July 7, 2014 did Ribbke believe that Akins was suffering from a life-threatening condition such that emergency treatment was necessary. (Ribbke Decl., ¶ 16.)

**RESPONSE:** Dispute. Whether or not Ribbke thought or believe that Akins was suffering from life-threatening conditions or that emergency treatment was necessary, when Akins presented to Ribbke and requested medical intervention, Ribbke was required to contact HSU. Ribbke is not a trained medical professional and must rely on the decisions of HSU staff. (Krasovec Decl. ¶ 10). Whether or not Ribbke thought or believed Akins was

- 39 -

experiencing an emergency or not, he had a responsibility and ministerial duty to contact HSU, as he could not diagnose Akins. (Ribbke Decl. ¶ 17; Krasovec Decl. ¶¶ 9-10).

> **REPLY: The plaintiff's response does not sufficiently dispute this proposed finding of fact; therefore, this proposed finding of fact should be deemed undisputed pursuant to Fed. R. Civ. P. 56(e). Instead of producing evidence challenging Ribbke's stated belief that Mr. Akins was not suffering from a life-threatening condition, Mr. Akins' response is conclusory and argumentative and, therefore, it should be disregarded by the court.**

67.   If Ribbke thought Akins had an emergency condition, he would have contacted the Health Services Unit and requested assistance on the unit, or arranged for Akins' immediate transfer to the Health Services Unit. (Ribbke Decl., ¶ 17.)

> **RESPONSE:** Dispute. See PRDPFOF ¶ 66, supra.

> **REPLY: The plaintiff's response does not sufficiently dispute this proposed finding of fact; therefore, this proposed finding of fact should be deemed undisputed pursuant to Fed. R. Civ. P. 56(e).**

68.     On July 16, 2014, Ribbke was assigned as a correctional officer on housing unit 4 during first shift and he was tasked with conducting cell searches. (Ribbke Decl., ¶ 18.)

RESPONSE: No dispute.

REPLY: This fact is undisputed so no response is necessary.

69.     Cell searches are conducted on a minimum of a monthly basis and may be conducted more often if necessary. Cell searches are typically alternated between shifts. For example, if a round of cell searches was conducted by second shift staff, the next round might be conducted by first shift staff. This is done to split up the work among staff.  (Ribbke Decl., ¶ 19.)

RESPONSE: Dispute. Cell searches are not always conducted on a monthly basis of all inmates' cells. (Akins Decl. ¶ 40; Lewis Decl. ¶ 11; Glover Decl., ¶ 8, Davis Decl., ¶ 6)

REPLY: Disputed but immaterial for the purpose of summary judgment.

70.     Cell searches are done throughout the month and documented in the housing unit search log book the documents the date, name of the inmate, DOC #, cell location, contraband located, staff involved, type of search and the shift during which the search occurred. (Ribbke Decl., ¶ 20, Ex. 1001.)

RESPONSE: Dispute. Not all cell searches are logged. (Akins Decl. ¶ 41).

REPLY:   Disputed, but not material for the purpose of summary judgment.

- 41 -

71.     Cell searches are done at the direction of the unit manager and to get all inmates in compliance with the property limits. Keeping inmates within the property limits is important because it reduces the risk of inmates possessing contraband.  (Ribbke Decl., ¶ 21.)

RESPONSE: No dispute.

REPLY: This fact is undisputed so no response is necessary.

72.     Contraband may include dangerous items such as weapons and drugs, and may also include other non-approved items, or excess items. Inmates are only allowed a certain number of items and certain types of items in their cell due to several reasons including: limited storage space, limited staff resources, to prevent gambling/trading among inmates, and because certain items may be used to inflict harm on oneself or others, such as weapons or drugs. (Ribbke Decl., ¶ 22.)

RESPONSE: No dispute.

REPLY: This fact is undisputed so no response is necessary.

73.     It is important to institution security and stability for staff to know what items are in the institution, and to be able to identify and remove non-approved items. Further, having excessive property in a cell over the institution limits gives an inmate more opportunity to hide potentially dangerous or disruptive items. It also requires more staff time to conduct a thorough search. Accordingly, regular cell searches occur to help address all of these concerns. (Ribbke Decl., ¶ 23.)

RESPONSE: No dispute.

- 42 -

**REPLY: This fact is undisputed so no response is necessary.**

74.    If an inmate is found to have contraband, they may receive a conduct report for violating Wis. Admin. Code § 303.47 or other contraband offenses. Conduct reports are written at the discretion of the staff involved. (Ribbke Decl., ¶ 24.)

**RESPONSE:** No dispute.

**REPLY: This fact is undisputed so no response is necessary.**

75.    On July 16, 2014, Ribbke conducted cell searches for six inmates, including Akins. Ribbke noted that Akins had extra linens and cardboard. (Ribbke Decl., ¶ 25, Ex. 1001.)

**RESPONSE:** No dispute.

**REPLY: This fact is undisputed so no response is necessary.**

76.    As noted on the log, Ribbke conducted a number of searches on July 15-16, 2014.  Akins' cell was one of many that Ribbke searched. (Ribbke Decl., ¶ 26, Ex. 1001.)

**RESPONSE:** No dispute that Akins' cell was one of eight that were written in the log book as having been searched by Ribbke.

**REPLY:    This fact is undisputed so no further reply is necessary.**

77.    During these cell searches, Ribbke found items such as cut-outs, which are clippings from a magazine (usually of women or cars) and they are not allowed because they are considered contraband as the magazine is now altered; clothes

lines; excess linens; and overdue library books. Ribbke found violations in two different cells for four different inmates, including Akins. (Ribbke Decl., ¶ 27, Ex. 1001.)

RESPONSE: No dispute.

REPLY: This fact is undisputed so no response is necessary.

78.    Ribbke confiscated all excess property and did not issue any conduct reports. (Ribbke Decl., ¶ 28.)

RESPONSE: No dispute.

REPLY: This fact is undisputed so no response is necessary.

79.    Ribbke did not write a conduct report to Akins for his excess property even though he could have pursuant to Wis. Admin. Code § 303.47. Ribbke did not feel that these items warranted a conduct report. (Ribbke Decl., ¶ 29.)

RESPONSE: No dispute.

REPLY: This fact is undisputed so no response is necessary.

80.    Ribbke may write a conduct report for an inmate that has been warned about this offense in the past or if the confiscated contraband is dangerous or harmful.   Dangerous or harmful contraband could be, but is not limited to, a weapon, tattoo equipment, and/or drug paraphernalia. (Ribbke Decl., ¶ 30.)

RESPONSE: Dispute. It is not required that an inmate be warned about the offense before he is written a conduct report for a violation, be it contraband or other offenses. (DOC Adm. Code Ch. 303.67(1)).

REPLY:  Undisputed for the purpose of summary judgment.

81.   After Ribbke's search of Akins' cell, Akins approached Ribbke at the officer's desk holding his electric razor in one hand and a flip switch in the other hand.  Akins asked Ribbke what happened to his razor because he always checks his stuff before he leaves his cell and he is wondering how his razor got broken. (Ribbke Decl., ¶ 31, Ex. 1002.)

RESPONSE: Object and dispute. Object on the basis this relies on a

sham affidavit to support this DPFOF. The razor was broken when Akins

went to see Ribbke at the desk, as this DPFOF proffers, later in DPFOF ¶¶

82-83 he is suggesting that the razor was never broken at all, and that he

would have confiscated the broken razor if he'd seen it. (Ribbke

Decl. ¶¶ 31-33; Akins Decl. ¶ 42).

> REPLY:  This is not a sham affidavit. Ribbke denies that he
> observed a broken razor in Akins' cell during the cell search.
> Plaintiff's cited evidence does not dispute this proposed fact
> and, it should be accepted as undisputed.

82.   Ribbke told Akins that he searched his cell and he inspected his razor, but he was not aware of any damage to the razor. Ribbke advised Akins to complete an offender complaint through the Inmate Complaint Review System (the proper channel to file a grievance) and also alerted Captain Keller of the situation. Ribbke completed an informational incident report, which was forwarded to his supervisor. (Ribbke Decl., ¶ 32, Ex. 1002.)

RESPONSE: Object and dispute. Ribbke observed the "electric razor in

one (of Akins'] hand[s] and a flip switch in the other hand." Clearly the razor had damage and that he was aware of it. If the razor he was looking at was not broken, he would not have advised Akins to use the ICRS to redress his complaint about broken razor, he would have written him a conduct report for lying pursuant to DOC Adm. Code 303 .31. (DPFOF ¶ 81-82; Ribbke Decl. ¶¶ 31-32; Akins ¶ 42). The sham affidavit rule applies to this DPFOF as well.

> **REPLY:    The defendants OBJECT because the plaintiff's assertion is conclusory and argumentative and, therefore, it should be disregarded by the court.  Mr. Akins does not dispute that Ribbke did not observe a  broken razor when he was doing the cell search.**

83.    If Ribbke had observed a damaged razor, he would have confiscated the razor as contraband and issued a contraband tag. There is no record of a contraband tag being issued. (Ribbke Decl., ¶ 33.)

> **RESPONSE:** Dispute. The razor was damaged, Ribbke was aware of it and he did not take the razor as contraband. (Ribbke Decl. ¶ 31; Akins Decl. ¶ 42; Lewis Decl., ¶ 12). Again, the sham affidavit rule applies to this DPFOF.

> **REPLY:  The plaintiff's response does not sufficiently dispute the following proposed findings of fact; therefore, they should be deemed undisputed pursuant to Fed. R. Civ. P. 56(e).  Mr. Akins does not dispute that there is no record of a contraband tag being issued for the damaged razor.   Further, Mr. Akins**

- 46 -

**does not dispute what Ribbke's stated practice is with respect to confiscating contraband.**

84.     A damaged razor is considered very dangerous contraband because it can be used as a weapon. The inmate could use the damaged razor on himself, another inmate or staff. Ribbke would never leave a damaged razor in any inmate's cell. (Ribbke Decl., ¶ 34.)

**RESPONSE:** Object and dispute. Electric razors that are broken are not very dangerous contraband. There are not blades that can easily slice skin. Typically broken razors only present a risk of abuse as a device to give a tattoo. In the 3 years Akins has been in prison, there have been zero incidents in which an inmate has used a broken razor to assault anyone. Again, Akins objects on the basis of the sham affidavit rule. Ribbke testified that he observed Akins approach the officer's desk holding his electric razor with parts of it in each hand but he failed to confiscate it as contraband. (Ribbke Decl. ¶¶ 31-33. Plainly Ribbke left a damaged razor in Akins' possession, and it was not until ICE Wogernese came to investigate the incident that the razor was confiscated from Akins, days later. (Akins Decl. ¶43 ; Lewis Decl. ¶ 12).

**REPLY:     The defendants OBJECT because the cited evidentiary material is an unqualified opinion from a witness who does not have personal knowledge and to which no foundation has been established to render such an opinion.** *See*

Fed. R. Evid. 602, 701, 702. Mr. Akins is a prison inmate, not a professional prison safety expert. Further, although Mr. Akins has personal knowledge regarding what incidents may or may not have happened on his housing unit, he is in a maximum security prison and would not have knowledge regarding security breaches in other parts of the prison that may have involved a broken razor.

85. If Akins had presented this razor to Ribbke, and if it was damaged, Ribbke would have properly confiscated this damaged razor as contraband. (Ribbke Decl., ¶ 35.)

RESPONSE: Dispute. Akins did present this razor to Ribbke and Ribbke did not confiscate the razor or the broken pieces. The sham affidavit rule applies here as well (See PRDPFOF ¶¶81-84, supra).

REPLY: Disputed, but not material for the purpose of summary judgment.

86. On or about July 18, 2014, Ribbke was contacted by institution complaint examiner Lucas Wogernese regarding an offender complaint that Akins had filed alleging that Ribbke damaged his personal property in response to his use of the Inmate Complaint Review System. (Ribbke Decl., ¶ 36, Ex. 1008, p. 2.)

RESPONSE: No dispute.

REPLY: This fact is undisputed so no response is necessary.

87.    Prior to July 18, 2014, Ribbke was not aware of any offender complaints that Akins had filed. (Ribbke Decl., ¶ 37.)

**RESPONSE:** Dispute. (See PRDPFOF ¶¶53-54).

**REPLY: See Defendants' Replies to Plaintiff's Responses to ¶ 53-54)**

88.    Ribbke told Mr. Wogernese that he conducted the cell search because they are required as a part of his job. Ribbke did not observe any damage to Akins' razor while he was in Akins' cell. (Ribbke Decl., ¶ 38, Ex. 1008, p. 2.)

**RESPONSE:** Dispute. Ribbke broke the razor during the cell search and thus obviously observed it while he was in Akins's cell, where he broke it. (Akins Decl. ¶ 44).

**REPLY: The defendants OBJECT because the cited evidentiary material lacks sufficient foundation. Declarations must be based on personal knowledge, and affidavits which fail to establish a sufficient foundation for the asserted proposition should be disregarded. *See* Fed. R. Civ. P. 56(c)(4)(e). Mr. Akins has already stated that he was not in his cell when the cell search occurred so he did not witness the search. (Dkt. 1 at 6.)**

89.    Ribbke also informed Mr. Wogernese that he did not pour out the inmate's prayer oil. (Ribbke Decl., ¶ 39, Ex. 1008, p. 2.)

**RESPONSE:** No dispute that Ribbke informed Mr. Wogernese that he

did not pour out Akins' prayer oil, though plaintiff affirmatively alleges he did pour it out. (Akins Decl. ¶¶ 49, 86 and 90; Lewis Decl., ¶ 12).

> **REPLY: The defendants OBJECT because the cited evidentiary material lacks sufficient foundation. Declarations must be based on personal knowledge, and affidavits which fail to establish a sufficient foundation for the asserted proposition should be disregarded.** *See* **Fed. R. Civ. P. 56(c)(4)(e). Mr. Akins has already stated that he was not in his cell when the cell search occurred so he did not witness the search. (Dkt. 1 at 6.)**

90.   This is the only contact Ribbke had with Mr. Wogernese regarding offender complaint No. CCI-2014-14038. (Ribbke Decl., ¶ 40.)

**RESPONSE:** No dispute.

> **REPLY: This fact is undisputed so no response is necessary.**

91.   Ribbke has never written any conduct reports to Akins. (Ribbke Decl., ¶ 41.)

**RESPONSE:** No dispute.

> **REPLY: This fact is undisputed so no response is necessary.**

92.   Krasovec did not write any other conduct reports to Akins other than the one described in paragraph 61 above. (Krasovec Decl., ¶ 22.)

**RESPONSE:** No dispute.

> **REPLY: This fact is undisputed so no response is necessary.**

93.     Until this lawsuit, Krasovec was not aware that Akins filed offender complaint No. CCI-2014-13312 in which he alleged that Ribbke and Krasovec refused to allow him to go to the Health Services Unit on July 7, 2014. Krasovec was never contacted about this offender complaint. (Krasovec Decl., ¶ 23, Ex. 1006.)

**RESPONSE:** Dispute. (See PRDPFOF ¶¶53-54).

> **REPLY:   See Defendants' Replies to Plaintiff's Responses to Defendants' Proposed Findings of Fact ¶ 53-54**

94.     Until this lawsuit, Krasovec was not aware that Akins filed offender complaint No. CCI-2014-13730 in which he alleged that Krasovec gave the Health Services Unit false information on June 29, 2014.  Krasovec was never contacted about this offender complaint. (Krasovec Decl., ¶ 24, Ex. 1007.)

**RESPONSE:** Dispute. (See PRDPFOF ¶¶53-54).

> **REPLY: See Defendants' Replies to Plaintiff's Responses to Defendants' Proposed Findings of Fact ¶ 53-54**

95.     At no time in June or July 2014 did Krasovec conduct a cell search of Akins' cell. (Krasovec Decl., ¶ 25.)

**RESPONSE:** No dispute, but affirmatively allege that Krasovec is the sergeant of the unit and informed/instructed the officer to conduct specific searches of cells. (Akins Decl. ¶ 45).

> **REPLY:  Undisputed for the purpose of summary judgment.**

96.     At no time in June or July 2014 did Krasovec touch or possess any of Akins' personal belongings from his cell. (Krasovec Decl., ¶ 26.)

**RESPONSE:** No dispute.

**REPLY: This fact is undisputed so no response is necessary.**

97.     In his role as litigation coordinator, Isaac Hart serves as a liaison with the Wisconsin Department of Justice staff who are assigned to defend Columbia and other Corrections employees in litigation filed by inmates.  Hart is responsible for assisting with obtaining responses to discovery requests, locating and retrieving documents, and coordinating contact among Department of Justice defense counsel and staff, inmates, and correctional staff defendants. In his capacity as both an institution complaint examiner and litigation coordinator, he has access to all records regularly maintained at Columbia.  (Hart Decl., ¶ 4.)

**RESPONSE:** No dispute.

**REPLY: This fact is undisputed so no response is necessary.**

98.     Hart reviewed Akins' Inmate Complaint History Report. (Hart Decl., ¶ 7.)

**RESPONSE:** No dispute.

**REPLY: This fact is undisputed so no response is necessary.**

99.     On June 30, 2014, the institution complaint examiner's office at Columbia received offender complaint CCI-2014-12680 in which Akins alleged that Ribbke and Krasovec denied him access to the Health Services Unit on June 29, 2014.  (Hart Decl., ¶ 8, Ex. 1005.)

**RESPONSE:** No dispute.

**REPLY: This fact is undisputed so no response is necessary.**

100.   Pursuant to Wis. Admin. Code § 310.16(1), Corrections shall ensure that complaints filed with the inmate complaint review system are confidential. Persons working in the inmate review complaint system may reveal the identity of complainants and the nature of the complaint only to the extent necessary to investigate the complaint, implement the remedy, or in response to litigation. (Hart Decl., ¶ 9.)

RESPONSE: No dispute.

REPLY: This fact is undisputed so no response is necessary.

101.   Because offender complaints are to remain as confidential as possible, the institution complaint examiners only interview staff as necessary in order to investigate the complaint. (Hart Decl., ¶ 10.)

RESPONSE: No dispute.

REPLY: This fact is undisputed so no response is necessary.

102.   Institution Complaint Examiner Wogernese interviewed Krasovec about this offender complaint. Krasovec explained that Akins reported feeling dizzy and light headed so he called the Health Services Unit and they advised that Akins should drink water and submit a Health Services Request form. Mr. Wogernese noted that Sergeant Krasovec's contact with the Health Services Unit was documented in housing unit 4's logbook. (Hart Decl., ¶ 11, Ex. 1005, p. 2.)

RESPONSE: No dispute that his DPFOF is accurate as written, but failed to accurately report the medical symptoms Akins complained of, willfully

denying Akins treatment from HSU by failing to relay these symptoms to HSU. (Akins Decl. ¶ 46).

> **REPLY: The defendants OBJECT because the plaintiff's assertion is conclusory and argumentative and, therefore, it should be disregarded by the court.**

103.   On July 7, 2014, Wogernese recommended this offender complaint be dismissed. (Hart Decl., ¶ 12, Ex. 1005, p. 2.)

**RESPONSE:** No dispute.

> **REPLY: This fact is undisputed so no response is necessary.**

104.   There is no record that Ribbke was contacted about or informed of this offender complaint. (Hart Decl., ¶ 13.)

**RESPONSE:** No dispute.

> **REPLY: This fact is undisputed so no response is necessary.**

105.   It is usual practice for the institution complaint examiner to contact only those necessary in order to investigate the complaint. Krasovec addressed the issue and the logbook showed that unit staff contacted the Health Services Unit on June 29, 2014.  (Hart Decl., ¶ 14, Ex. 1005, p. 12.)

**RESPONSE:** No dispute, but affirmatively allege that the inmate complaint examiner was required to but did not interview Akins in this matter, even though he alleged staff misconduct. (See DAI Policy 310.00.01 (1); Akins, Decl. ¶ 47).

**REPLY:  Disputed, but immaterial for the purpose of summary judgment.**

106.   On July 8, 2014, the institution complaint examiner's office at Columbia received offender complaint CCI-2014-13312 in which Akins alleged that Ribbke and Krasovec refused to allow him to be seen by the Health Services Unit on July 7, 2014. (Hart Decl., ¶ 15, Ex. 1006.)

**RESPONSE:** No dispute.

**REPLY: This fact is undisputed so no response is necessary.**

107.   Hart rejected this offender complaint as having been previously addressed pursuant to Wis. Admin. Code § DOC 310.11(5)(g). (Hart Decl., ¶ 16, Ex. 1006, p. 2.)

**RESPONSE:** No dispute.

**REPLY: This fact is undisputed so no response is necessary.**

108.   Because this offender complaint was rejected, Ribbke and Krasovec were not contacted about or informed of this offender complaint. (Hart Decl., ¶ 17.)

**RESPONSE:** No dispute.

**REPLY: This fact is undisputed so no response is necessary.**

109.   On July 15, 2014, the institution complaint examiner's office at Columbia received offender complaint CCI-2014-13730 in which Akins alleged that Krasovec gave the Health Services Unit false information on June 29, 2014. (Hart Decl., ¶ 18, Ex. 1007.)

**RESPONSE:** No dispute.

**REPLY: This fact is undisputed so no response is necessary.**

110. Mr. Wogernese rejected this offender complaint because it was submitted beyond 14 calendar days from the date of the occurrence giving rise to the complaint and the inmate provided no good cause to extend the time limit pursuant to Wis. Admin. Code § DOC 310.11(5)(d). (Hart Decl., ¶ 19, Ex. 1007, p. 2.)

**RESPONSE:** Dispute. Plaintiff Akins doesn't dispute that the complaint was rejected Wogemese, he disputes that the complaint was submitted beyond 14 calendar days from the date of the occurrence giving rise to the complaint. The incident was on June 29, 2014 and Akins submitted the complaint on July 13, 2014, exactly 14 days later. (Akins Decl. ¶ 48).

**REPLY:  Disputed, but immaterial for the purpose of summary judgment.**

111. Because this offender complaint was rejected, Krasovec was not contacted about or informed of this offender complaint. (Hart Decl., ¶ 20.)

**RESPONSE:** No dispute.

**REPLY: This fact is undisputed so no response is necessary.**

112. On July 18, 2014, the institution complaint examiner's office at Columbia received offender complaint CCI-2014-14038 in which Akins alleged that Ribbke damaged his razor during a cell search in retaliation for Akins using the inmate complaint review system. (Hart Decl., ¶ 21, Ex. 1008.)

**RESPONSE:** No dispute.

**REPLY: This fact is undisputed so no response is necessary.**

113.   Mr. Wogernese interviewed Ribbke about this offender complaint. Mr. Wogernese noted that Ribbke reported conducting the cell search because it is required for his job and not because of Akins' use of the inmate complaint review system. (Hart Decl., ¶ 22, Ex. 1008, p. 2.)

RESPONSE: No dispute that Ribbke reported he conducted the cell search because it was required for his job and not because of Akins use of the ICRS, but affirmatively allege that he broke Akins' razor and poured out his prayer oil in retaliation for using the ICRS. (Akins Decl. ¶ 49; Lewis Decl., ¶12).

**REPLY:   Plaintiff does not dispute that Ribbke's cell search was not retaliatory. As to the plaintiff's additional assertions, these facts are disputed.**

114.   Ribbke further stated that he did not observe any damage to the razor during the cell search and that if he had observed a damaged razor, he would have seized it as contraband and issued a contraband tag. If Ribbke had broken the razor, he would have seized it and completed an incident report.  Mr. Wogernese noted that there is no contraband tag or incident report. (Hart Decl., ¶ 23, Ex. 1008, p. 2.)

RESPONSE: Dispute that Ribbke did not observe damage to the razor as he caused the damage and testified that he observed the razor broken in Akins' hands. (See PRDPFOF ¶¶ 81-85, 113).

**REPLY:  The plaintiff's response does not sufficiently dispute this proposed finding of fact; therefore, this proposed finding of fact should be deemed undisputed pursuant to Fed. R. Civ. P. 56(e). See Defendants' Replies to Plaintiff's Responses to Defendants' Proposed Findings of Fact, ¶ 81-85, 113.**

115.   Hart noted that prior to this offender complaint, Akins did not file any offender complaints about which the institution complaint examiner's office contacted Ribbke. (Hart Decl., ¶ 24.)

**RESPONSE:** No dispute.

**REPLY: This fact is undisputed so no response is necessary.**

116.   On July 21, 2014, the institution complaint examiner's office at Columbia received offender complaint CCI-2014-14164 in which Akins alleged that he filed offender complaint CCI-2014-13312 alleging that Krasovec refused to allow Akins to be seen by the Health Services Unit, and he is now experiencing actions of retaliation for his use of the inmate complaint review system. Akins alleged that Krasovec wrote him a conduct report because he was upset that Akins used the inmate complaint review system. (Hart Decl., ¶ 25, Ex. 1009.)

**RESPONSE:** No dispute.

**REPLY: This fact is undisputed so no response is necessary.**

117.   Mr. Wogernese rejected this offender complaint because it was not within the scope of the inmate complaint review system as defined in section

DOC 310.08, pursuant to Wis. Admin. Code § DOC 310.11(5)(h). (Hart Decl., ¶ 26, Ex. 1009, p. 2.)

> **RESPONSE:** No dispute. Plaintiff affirmatively alleges that retaliation is the issue at bar, not the disciplinary process, and that eh retaliation is within the scope of the ICRS. (See DOC 310.08).

> > **REPLY: Plaintiff does not dispute this fact, so no reply is necessary. As to Plaintiff's additional allegations, undisputed for the purpose of summary judgment.**

118.    Under Wis. Admin. Code § DOC 310.08(2), an inmate may not use the inmate complaint review system to raise an issue related to a conduct report unless the inmate has exhausted the disciplinary process. (Hart Decl., ¶ 27.)

> **RESPONSE:** No dispute. (PRDPFOF ¶117)

> > **REPLY: This fact is undisputed so no response is necessary.**

119.    Because this offender complaint was rejected, Krasovec was not contacted about or informed of this offender complaint. (Hart Decl., ¶ 28.)

> **RESPONSE:** No dispute.

> > **REPLY: This fact is undisputed so no response is necessary.**

120.    On August 5, 2014, the institution complaint examiner's office at Columbia received offender complaint CCI-2014-15321 in which Akins alleged that Krasovec was lacking in his job duties in that Krasovec almost delivered Akins mail to another inmate with a similar name. (Hart Decl., ¶ 29, Ex. 1010.)

> **RESPONSE:** No dispute.

**REPLY: This fact is undisputed so no response is necessary.**

121.    Mr. Wogernese interviewed Krasovec to determine if there was a mail delivery issue.   Krasovec was unaware about any issues with the inmate mail. (Hart Decl., ¶ 30, Ex. 1010, p. 2.)

RESPONSE: Dispute, but only to the extent that Krasovec was aware of there being issues with the mail. (Akins Decl. ¶ 50; Lewis Decl., ¶ 13).

**REPLY:  Undisputed for the purpose of summary judgment.**

122.    Mr. Wogernese noted that Akins admitted that his mail was not given to another inmate and he was only speculating that it was almost delivered to another inmate. (Hart Decl., ¶ 31, Ex. 1010, p. 2.)

RESPONSE: No dispute that this was Wogemese's conclusion, but Akins almost received someone else's mail as a result of Krasovec's failure to be cognizant of similar names and other issues with mail delivery. (Akins Decl. ¶ 51).

**REPLY: Undisputed for the purpose of summary judgment.**

123. Based   on   the   frivolous   nature   of   the   offender   complaint, Mr. Wogernese rejected the offender complaint without addressing the merits because the complaint was submitted solely for the purpose of harassing or causing malicious injury to Krasovec. (Hart Decl., ¶ 32, Ex. 1010, p. 2.)

RESPONSE: No dispute that the complaint was rejected, however dispute that the complaint was submitted solely for the purposes of harassing or

causing malicious injury to Krasovec. Akins intended only to prevent mail issues in the future. (Akins Decl. ¶ 52).

> **REPLY: Disputed, but not material for the purpose of summary judgment.**

124.   Akins has not filed any further offender complaints related to Ribbke or Krasovec. (Hart Decl., ¶ 33.)

**RESPONSE:** No dispute.

> **REPLY: This fact is undisputed so no response is necessary.**

Dated this 5th day of July, 2016.

BRAD D. SCHIMEL
Wisconsin Attorney General


s/ Laure Rakvic-Farr
LAURE RAKVIC-FARR
Assistant Attorney General
State Bar #1049540

Attorneys for Defendants

Wisconsin Department of Justice
Post Office Box 7857
Madison, Wisconsin 53707-7857
(608) 266-0323
(608) 267-8906 (Fax)
rakvic-farrlc@doj.state.wi.us