IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WISCONSIN

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

ARSENIO R. AKINS,                                          OPINION AND ORDER

          Plaintiff,                                  15-cv-118-bbc

    v.

GARY MAIER, CHARLES RIBBKE and
JOSEPH KRASOVEC,

          Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

Plaintiff Arsenio Akins, a prisoner at Columbia Correctional Institution, filed this civil lawsuit against defendants Gary Maier, Charles Ribbke and Joseph Krasovec. Plaintiff contends that defendant Maier subjected him to cruel and unusual punishment in violation of the Eighth Amendment and committed medical negligence by abruptly discontinuing his medication. With respect to defendants Ribbke and Krasovec, plaintiff contends that they ignored his medical complaints, in violation of his Eighth Amendment rights. Plaintiff also contends that defendants Ribbke and Krasovec retaliated against him for filing grievances, in violation of his First Amendment rights.

Defendants have filed a motion for summary judgment on all of plaintiff's claims, which I am granting in part and denying in part. Plaintiff's Eighth Amendment claim against Maier fails because the withdrawal symptoms plaintiff allegedly experienced were minor and Maier made a reasoned medical decision to discontinue plaintiff's medication,

1

rather than taper it.  Plaintiff's Eighth Amendment claims against Ribbke and Krasovec fail because both defendants responded to plaintiff's medical needs and any harm attributable to their delay in securing plaintiff care was not sufficient to support a claim under the Eighth Amendment.  I am also dismissing plaintiff's First Amendment claims against Krasovec because there is no evidence tying the deprivations plaintiff suffered at Krasovec's hands to retaliatory animus.  However, there is a genuine issue of material fact with respect to whether defendant Ribbke denied plaintiff medical care in retaliation for plaintiff's filing complaints against him and other prison personnel.  Accordingly, this claim will proceed to trial.  Finally, I am dismissing plaintiff's state law negligence claim against Maier because there is no evidence that Maier violated the standard of care by failing to prescribe a tapering regimen or that this decision caused plaintiff's alleged injuries.

Plaintiff has also filed two motions for assistance with recruiting counsel, but I am denying these requests because plaintiff has failed to demonstrate that he has made an adequate effort to find counsel on his own.  Furthermore, even if plaintiff had satisfied this obligation, I would deny his motions because he has failed to establish that he is incapable of continuing to represent himself in this case.

From the parties' summary judgment materials and the record, I find that the following facts are not subject to genuine dispute.

UNDISPUTED FACTS

Plaintiff has been incarcerated at Columbia Correctional Institution since April 9, 2013. During the relevant time period, defendant Gary Maier was employed as one of the prison's psychiatrists and was responsible for treating plaintiff. Maier treated plaintiff primarily for depression and prescribed a variety of medications. Plaintiff frequently complained that these medications were either ineffective or caused unwanted side effects.

Initially, on December 19, 2013, Maier prescribed plaintiff venlafaxine, a drug used to treat depression. Maier scheduled a followup appointment for two months later to see how the venlafaxine was working. At the February 19, 2013 followup appointment, plaintiff stated that although he had been taking the venlafaxine for a while, he had decided to stop taking it because it made him tired. Plaintiff did not discuss the decision to stop taking venlafaxine with Maier. Maier and plaintiff discussed other possible drugs for treating plaintiff's depression, including paroxetine, which belonged to a different class of antidepressants. Plaintiff said he was willing to try paroxetine, so Maier prescribed it and entered an order for it to start the following day.

Maier's notes from the April 2, 2014 followup appointment indicate that plaintiff reported that the paroxetine was working "a little bit," that he was able to tolerate the drug and that he was not experiencing any side effects. (However, plaintiff asserts at summary judgment that he informed Maier that the paroxetine made him feel "weird.") Maier and plaintiff agreed to increase plaintiff's paroxetine dose from 20 mg to 40 mg per day. Maier scheduled another followup appointment for May 28, 2014.

3

At the May 28, 2014 appointment, plaintiff stated that he was beginning to have periodic headaches.  Maier believed these headaches may have been attributable to trazadone, a drug Maier had prescribed plaintiff to help him sleep.  Maier and plaintiff agreed to switch from trazadone to diphenhydramine in an effort to resolve his headache symptoms.  However, they decided they would continue to use paroxetine to treat his depression.

Maier and plaintiff met again on June 24, 2014. Plaintiff stated that he was continuing to have headaches and that he believed the paroxetine was making him feel sick. Maier believed that the headaches and other side effects plaintiff was experiencing may have been attributable to the paroxetine.   Plaintiff also complained that the paroxetine was not helping him with his "legal work."  (Plaintiff's concerns about his legal work and his frequent complaints about his antidepressants led Maier to suspect that plaintiff was seeking other drugs, such as Adderall, a controlled substance that plaintiff was prescribed while in prison. However, prison officials soon discovered that plaintiff was abusing his Adderall so they discontinued the prescription.)   After informing plaintiff that the drugs were not being prescribed to help with his legal work, Maier and plaintiff discussed the side effects plaintiff was experiencing.  Ultimately, Maier suggested that plaintiff try fluoxetine.  Fluoxetine is similar to paroxetine and in the same class of anti-depressants, but it has a different side effect profile.  Plaintiff agreed to try fluoxetine, so Maier discontinued plaintiff's paroxetine. The fluoxetine had to be ordered from the prison's central pharmacy, a process Maier knew would take approximately one week.  Maier also knew that during this one-week period,

4

plaintiff would be without either paroxetine or fluoxetine.

Five days later, on June 29, 2014 at approximately 11:00 a.m., plaintiff entered the housing unit's dayroom and approached Ribbke and Krasovec.  Plaintiff informed them that he wanted them to send him to the health services unit because he was experiencing various symptoms, including dizziness, lightheadedness and a headache.  Plaintiff compared his symptoms to a "hangover."  Krasovec contacted the health services unit and described plaintiff's symptoms.  The nurse Krasovec spoke with determined that plaintiff's symptoms did not present an emergency.   She instructed Krasovec to send plaintiff to his cell to rest and advise him to drink fluids, which Krasovec did.  (Plaintiff alleges that Krasovec misinformed the health services unit that plaintiff had recently been in the recreation yard and that he appeared to be dehydrated.  Defendants dispute that Krasovec made any such misrepresentation and further state that even if they had, this fact is immaterial.)  Plaintiff then returned to his cell to rest.

Later that day at approximately 4:30 p.m., a health services unit nurse, Joe Reda, stopped by plaintiff's cell and examined him.  Plaintiff complained that he was experiencing chest pain, dizziness and was unable to sleep.  Reda's treatment notes indicate that plaintiff told Reda he felt like he was "coming off a hangover."  Reda contacted the on-call physician. Plaintiff informed the physician of his symptoms and that he initially thought the symptoms were attributable to the fact that he was fasting for Ramadan.  However, plaintiff stated that he had stopped fasting, but his symptoms persisted, so he believed that they might be attributable to the discontinuance of his paroxetine. The on-call physician agreed to restart

5

plaintiff's paroxetine for a short period of time until plaintiff's fluoxetine arrived from the central pharmacy. Plaintiff's paroxetine was restarted the next day; all told, he was without his paroxetine or a similar antidepressant for a total of six days.

The following day, on June 30, 2014, plaintiff filed formal complaints against defendants Ribbke, Krasovec and Maier. In plaintiff's complaint against Ribbke and Krasovec, he alleged that they should not have prevented him from visiting the health services unit when he began to experience withdrawal symptoms on June 29, 2014. The institution's complaint examiner interviewed Krasovec regarding the complaint, but did not interview Ribbke. As for plaintiff's complaint against Maier, he complained that Maier should have tapered him off his paroxetine rather than discontinue the drug abruptly.

Plaintiff eventually received his fluoxetine and began taking it on July 3, 2014. However, on July 6, 2014 plaintiff was given the wrong medication on the pill line. The following day, he began to feel dizzy and lightheaded again. Plaintiff approached Krasovec at the officer's desk at approximately 11:40 a.m. and demanded that he be sent to the health services unit immediately. (Plaintiff also alleges that he had approached Ribbke asking to be taken to the health services unit earlier that day, but Ribbke had refused because he was not going to let plaintiff get more people in trouble with his "bullshit complaints." Ribbke does not recall ever speaking with plaintiff on July 7 and denies that he would have refused to alert the health services unit to plaintiff's need for medical care.) Krasovec and plaintiff discussed plaintiff's symptoms and eventually Krasovec attempted to contact the health services unit as requested. However, Krasovec was unable to get through to the health

services unit because the phone line was busy.  Plaintiff became argumentative and demanded that he be allowed to go to the health services unit immediately.  Krasovec instructed plaintiff to return to his cell while he attempted to contact the health services unit.  Plaintiff continued to argue, but eventually returned to his cell. When Krasovec told plaintiff his cell door needed to be shut, plaintiff slammed his door.  Krasovec got through to the health services unit soon thereafter and a nurse saw plaintiff at 12:05 p.m., less than thirty minutes after plaintiff approached Krasovec about his dizziness.

Later that day, Krasovec wrote plaintiff a conduct report for his disruptive behavior in the day room and for the manner in which he had demanded to be seen by the health services unit.  Krasovec alleged that plaintiff violated Wis. Admin. Code §§ DOC 303.24 ("Disobeying Orders"), DOC 303.28 ("Disruptive Conduct") and DOC 303.63 ("Violations of Institution Policies").  Plaintiff was found guilty of disobeying orders and violating institution policies, but was deemed not guilty of engaging in disruptive conduct.

On July 16, 2014, defendant Ribbke was assigned to plaintiff's housing unit and was assigned the task of conducting cell searches.  All inmates' cells are searched approximately once a month by prison policy and are performed at the direction of the prison's unit managers.  That day Ribbke searched six inmates' cells, including plaintiff's.  During the search, Ribbke discovered a number of violations, but let plaintiff off with a warning instead of writing him a conduct report.  Afterwards, plaintiff accused Ribbke of breaking plaintiff's electric razor and pouring out his prayer oil during the cell search.  Ribbke denied breaking plaintiff's razor or touching his prayer oil and informed plaintiff that he should file an

inmate complaint if he believed that Ribbke had destroyed plaintiff's property.  Plaintiff heeded Ribbke's advice and filed another complaint against Ribbke, accusing him of damaging and destroying his property in retaliation for the prior complaints plaintiff had filed against Ribbke.  Ribbke  notified his supervisor of plaintiff's allegations and filed an informational report regarding the search.


OPINION

I.  PLAINTIFF'S MOTIONS FOR ASSISTANCE IN RECRUITING COUNSEL

Before addressing defendants' motion for summary judgment, I must address plaintiff's motions for assistance in recruiting counsel.  In a previous order entered on August 28, 2015, I denied plaintiff's motion for assistance in recruiting counsel for two reasons.  First, I concluded that plaintiff had failed to make a sufficient effort to recruit counsel on his own, and therefore I directed him to write to at least two more lawyers regarding representation.  Second, I concluded that as of the date of that order, plaintiff had failed to establish that the complexity of the case was beyond his abilities.  I instructed plaintiff that he could renew his motion at a later date, but that any renewed motion would have to be accompanied by either: (1) the responses he received to the letters I instructed him to write to lawyers regarding representation or (2) copies of his letters to the lawyers, the dates he sent the letters and a sworn declaration that he had sent them with proper postage.  Dkt. #28 at 2-3.

After defendants filed their motion for summary judgment, plaintiff renewed his

requests for assistance in recruiting counsel, which are presently before the court.  I am denying these motions because plaintiff has still not demonstrated that he has made a sufficient effort to recruit counsel on his own.  Pruitt v. Mote, 503 F.3d 647, 655 (7th Cir. 2007) (holding that before court can assist indigent plaintiff with recruitment of counsel, plaintiff must demonstrate that he has "made a reasonable attempt to obtain counsel or been effectively precluded from doing so").  Although plaintiff states in the declaration accompanying his renewed motion that he has written to additional lawyers since his last motion for assistance was denied and that these lawyers have not responded, he identifies only one of the firms to which he has written.  Moreover, plaintiff did not follow my express instruction that to demonstrate that he has made sufficient efforts to recruit counsel on his own, he was to provide copies of the letters he sent, identify the dates he sent them and must submit a declaration that he sent the letters with proper postage.

Even if plaintiff had submitted sufficient proof regarding his efforts to recruit counsel on his own, I would still deny his motion on the ground that he has failed to demonstrate that this case is too complex for him to litigate without the assistance of an attorney.  Mote, 503 F.3d at 655 (requiring plaintiff to show that "the difficulty of the case—factually and legally—exceeds the particular plaintiff's capacity as a layperson to coherently present it to the judge or jury himself.").  Plaintiff states that he "has no understanding of the complex rules [for] responding to [defendant's motion for summary judgment] and . . . he will be unable to file a proper response[.]"  Although the summary judgment briefing may have taken much longer than normal, plaintiff's responses to defendants' briefing and to their

proposed facts were articulate and well-reasoned.  Plaintiff also states that he does not understand what he has to prove to survive summary judgment.  However, the elements of plaintiff's claims were clearly laid out for him in the twenty-page screening order issued at the outset of this case.  Plaintiff's summary judgment response brief and his responses to plaintiff's proposed findings of fact indicate that he has a sufficient understanding of his claim to continue in this case without the assistance of counsel.

Finally, plaintiff argues that I should not judge his abilities based on the filings in this case thus far because these filings were prepared with the assistance of a jailhouse lawyer.  However, the fact that a jailhouse lawyer has assisted plaintiff is not proof that plaintiff is himself incapable of presenting his case.  A litigant's reliance on a fellow inmate for assistance in drafting legal filings does not factor into a court's analysis when deciding whether to assist with the recruitment of counsel.  Henderson v. Ghosh, 755 F.3d 559, 564 (7th Cir. 2014) ("[T]he fact that an inmate receives assistance from a fellow prisoner should not factor into the decision whether to recruit counsel.").  A court can neither grant nor deny a litigant's motion for assistance with the recruitment of counsel on the ground that he has had the assistance of a jailhouse lawyer.


## II. DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

In the June 23, 2015 screening order, I granted plaintiff leave to proceed on claims that (1) defendant Maier violated plaintiff's Eighth Amendment rights by abruptly discontinuing plaintiff's paroxetine medication; (2) defendants Krasovec and Ribbke violated

plaintiff's Eighth Amendment rights by ignoring his requests for medical assistance; (3) defendants Krasovec and Ribbke retaliated against plaintiff for filing grievances against them by failing to provide him medical care, filing a false conduct report against him and destroying his property; and (4) defendant Maier acted negligently by discontinuing plaintiff's antidepressant medication.  I will address each of these claims in turn.

### A.  Eighth Amendment Claim Against Maier

Defendant Maier is entitled to summary judgment on plaintiff's claim that Maier violated plaintiff's Eighth Amendment rights by failing to "taper" him off of his paroxetine. To establish that defendant Maier violated his Eighth Amendment rights, plaintiff must show that Maier was "deliberately indifferent" to a "serious medical need."  Estelle v. Gamble, 429 U.S. 97, 104-05 (1976).  Plaintiff must also demonstrate that Maier's deliberate indifference caused his injuries.  Henderson v. Sheahan, 196 F.3d 839, 848 (7th Cir. 1999).  Plaintiff has failed to create a genuine issue of material fact with respect to any one of these requirements.

First, plaintiff has failed to create a genuine issue of material fact with respect to whether a "tapering" regime for antidepressants qualifies as a "serious medical need."  A serious medical need exists when the failure to provide a particular treatment might be "life threatening" or poses "a risk of needless pain or lingering disability."  Davis v. Jones, 936 F.2d 971, 972 (7th Cir. 1991).  Plaintiff's alleged symptoms fall below this standard.  The only symptoms plaintiff reported to the health services unit were headaches, dizziness and

lightheadedness and nausea, which he compared to a "hangover." (On summary judgment, plaintiff says that he was having and continues to have "severe migraines," which he attributes to the paroxetine withdrawal.  There is no evidence in the record that the symptoms plaintiff was experiencing after the discontinuance of his paroxetine were in fact migraines.)  The Court of Appeals for the Seventh Circuit has held that these types of "relatively minor" harms are insufficient to give rise to an Eighth Amendment claim. Henderson, 196 F.3d at 846 (prisoner's complaints that he was having "breathing problems, chest pains, dizziness, sinus problems, headaches and a loss of energy" failed to state claim under Eighth Amendment); Reed v. McBride, 178 F.3d 849, 853 (7th Cir. 1999) ("Not all medical conditions are sufficiently serious to implicate the Eighth Amendment.  For example, a prison medical staff's refusal to 'dispense bromides for the sniffles or minor aches and pains or a tiny scratch or a mild headache or minor fatigue . . . does not violate the Constitution.'") (quoting Cooper v. Casey, 97 F.3d 914, 916 (7th Cir. 1996); Oliver v. Deen, 77 F.3d 156 (7th Cir. 1996) (prisoner complaints about wheezing, shortness of breath, dizziness and nausea attributable to cellmate's smoking habits held insufficient to state claim under Eighth Amendment).

Second, plaintiff has failed to present any evidence that his alleged "withdrawal symptoms" were attributable to the abrupt discontinuation of his paroxetine or that a tapering regimen would have mitigated these symptoms.  Henderson, 196 F.3d at 848 ("[A] plaintiff must demonstrate both that he has suffered an 'actual' present injury and that there is a causal connection between that injury and the deprivation of a constitutionally protected

right caused by a defendant."). Although the paroxetine information sheet states that people taking paroxetine should not abruptly discontinue the medication, it does not state that tapering has any effect on the type of withdrawal symptoms plaintiff experienced. Similarly, plaintiff offers no evidence to support his belief that his alleged "migraine headaches" were caused by the abrupt discontinuation of paroxetine and it is entirely speculative whether a tapering regimen would have prevented these headaches.

Finally, even if I were to conclude that plaintiff's symptoms were sufficiently serious and also were caused by the abrupt discontinuance of his paroxetine, I would still dismiss plaintiff's Eighth Amendment claim because Maier's decision to discontinue plaintiff's paroxetine without tapering was a reasoned medical decision. Snipes v. DeTella, 95 F.3d 586, 591 (7th Cir. 1996) ("Medical decisions that may be characterized as 'classic examples of matters for medical judgment,' such as whether one course of treatment is preferable to another, are beyond the [Eighth] Amendment's purview. Such matters are questions of tort, not constitutional law.") (quoting Estelle, 429 U.S. at 106). Plaintiff was complaining about various side effects, including headaches, allegedly associated with the paroxetine prior to the drug's being discontinued. Maier states that the fastest way to alleviate these side effects was to discontinue the paroxetine and that tapering would have subjected plaintiff to these side effects longer. Maier Decl., dkt. #36 at ¶ 29. Furthermore, Maier states that plaintiff was taking a moderate dose of paroxetine for only a short period of time, so any withdrawal side effects would be expected to be relatively inconsequential. Id. at ¶ 31. Finally, the fact that plaintiff did not experience any side effects when he stopped taking his venlafaxine,

13

which is a drug similar to paroxetine, was a good clinical indicator that he would not be apt to experience any withdrawal symptoms from discontinuing paroxetine.  Id. at ¶ 34. Ultimately, Maier determined that "[t]he risk of suffering withdrawal symptoms, such as headaches, did not outweigh the benefits of tapering off the medication since the medication was already self-reportedly causing headaches and not providing any positive results."  Id. at ¶33.

Defendant Maier's explanation is reasonable on its face and is strong evidence that he used medical judgment when deciding to discontinue the paroxetine.  Further, plaintiff does not offer any evidence to demonstrate that Maier's discontinuation of plaintiff's paroxetine was "such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible did not base the decision on such a judgment."  Estate of Cole by Pardue v. Fromm, 94 F.3d 254, 261-62 (7th Cir. 1996).

### B. Eighth Amendment Claims Against Ribbke and Krasovec

I am dismissing plaintiff's claim that defendants Ribbke and Krasovec violated his Eighth Amendment rights because the undisputed facts establish that neither Ribbke nor Krasovec was deliberately indifferent to plaintiff's serious medical needs.  Plaintiff states that on June 29, 2014 and July 7, 2014, both Krasovec and Ribbke delayed providing him medical care for his alleged withdrawal symptoms.  This claim fails for a number of reasons.

First, as discussed above, plaintiff's withdrawal symptoms were minor and fail to support an Eighth Amendment claim.  Second, even if they were sufficiently serious, there

is no evidence that they were exacerbated or that plaintiff suffered needlessly because of any alleged delay.  On June 29, plaintiff was required to wait a few hours before a health services unit nurse examined him; on July 7 plaintiff was seen within 30 minutes of complaining to Krasovec.  In neither case does plaintiff say that his symptoms or suffering would have been alleviated had defendants provided him immediate medical attention.  Petties v. Carter, No. 14-2674, (7th Cir. Aug. 23, 2016) ("To show that a delay in providing treatment is actionable under the Eighth Amendment, a plaintiff must also provide independent evidence that the delay exacerbated the injury or unnecessarily prolonged pain."); Langston v. Peters, 100 F.3d 1235, 1241 (7th Cir. 1996) ("We have held in the past that a two-hour delay is not an unreasonably long wait for an x-ray, an examination, and possibly a set of a fracture. In fact, the public often waits longer at hospital emergency rooms.") (internal citations omitted).

Finally, plaintiff has failed to set forth any evidence that the delays he experienced were attributable to Ribbke's or Krasovec's deliberate indifference.  The delay on June 29 was attributable to the fact that the health services unit nurse did not believe plaintiff's symptoms presented an emergency and advised plaintiff to return to his cell and rest.  Berry v. Peterman, 604 F.3d 435, 439-40 (7th Cir. 2010) ("As a nonmedical administrator, [defendant] was entitled to defer to the judgment of jail health professionals so long as he did not ignore [plaintiff].") (citing Hayes v. Snyder, 546 F.3d 516, 527-28 (7th Cir. 2008).  Plaintiff contends that Krasovec incorrectly told the health services unit nurse that plaintiff had just returned from recreation on June 29, but even if Krasovec mistakenly said that,

15

there is no evidence that he was driven by a desire to deprive plaintiff of necessary medical care. As for the July 7 incident, plaintiff does not deny that the short delay in obtaining care was attributable to the fact that the health services unit's phone line was busy.

### C. First Amendment Retaliation Claim Against Ribbke and Krasovec

In addition to claiming that they violated his Eighth Amendment rights, plaintiff claims that defendants Ribbke and Krasovec violated his rights under the First Amendment by retaliating against him after plaintiff filed various inmate complaints and grievances against them. To prevail on a First Amendment retaliation claim, plaintiff must show that: (1) he engaged in activity protected by the First Amendment; (2) he suffered a deprivation that likely would deter future First Amendment activity; and (3) the First Amendment activity was at least a motivating factor in the defendant's decision to take retaliatory action. Bridges v. Gilbert, 557 F.3d 541, 546 (7th Cir. 2009); Greene v. Doruff, 660 F.3d 975, 979 (7th Cir. 2011). Although I am concluding that defendant Krasovec is entitled to summary judgment on this claim, I conclude that there is a genuine issue of material fact with respect to whether defendant Ribbke refused to secure plaintiff medical care because plaintiff filed complaints against him.

Between July 15, 2014 and August 5, 2014, plaintiff filed a number of offender complaints against Ribbke, Krasovec or both. It is undisputed that these complaints, which generally related to how Ribbke and Krasovec handled plaintiff's various medical complaints, are protected by the First Amendment. Gomez v. Randle, 680 F.3d 859, 866 (7th Cir.

16

2012) ("A prisoner has a First Amendment right to make grievances about conditions of confinement.") (quoting <u>Watkins v. Kasper</u>, 599 F.3d 791, 798 (7th Cir. 2010)).  As a consequence of filing these complaints, plaintiff contends that he suffered four separate adverse actions—two at the hands of Krasovec and two at the hands of Ribbke.  Specifically, he contends that (1) Krasovec delayed in securing him medical care on July 7; and (2) issued him a conduct report without justification.  With respect to Ribbke, plaintiff contends that, also in retaliation for the various complaints he filed, Ribbke (3) refused to provide him medical care on July 7; and (4) conducted an unwarranted cell search on July 16, destroying plaintiff's razor and prayer oil in the process.

With respect to plaintiff's claims against Krasovec, the alleged conduct is sufficiently adverse to support a First Amendment claim because it is reasonable to infer that delaying medical care and issuing false conduct reports would "deter a person of ordinary firmness" from engaging in similar conduct in the future.  <u>Bridges</u>, 557 F.3d at 552 (deprivation sufficient to support First Amendment retaliation claim if it would "deter a person of ordinary firmness" from exercising First Amendment activity in the future) (quoting <u>Bart v. Telford</u>, 677 F.2d 622, 625 (7th Cir. 1982)).  However, plaintiff's claims fail on the third element because he has not set forth any evidence showing that Krasovec was motivated by plaintiff's protected conduct.  Plaintiff does not dispute Krasovec's assertion that the delay in obtaining him care on July 7 was attributable to the fact that the phone line was busy.  Similarly, there is no evidence that Krasovec's decision to issue him a conduct report was motivated by retaliatory animus; the conduct report's allegations were sustained at a hearing.

17

Even if the conduct report were a complete fabrication, this does not give rise to an inference that it was issued to retaliate against plaintiff.

As for plaintiff's allegations against Ribbke, I agree with defendants that plaintiff has no evidence showing that the cell search was conducted to retaliate against him for filing complaints. It is undisputed that all inmates are subject to periodic cell searches to ensure that they are in compliance with the prison's property limits and that these searches are conducted approximately once a month and are done at the direction of the unit manager. On the day in question, Ribbke conducted a search of the cells of at least six inmates. There is no evidence that plaintiff was singled out or that his cell search was conducted for anything other than legitimate penological reasons. There is also no evidence that it was Ribbke that damaged plaintiff's razor or poured out his prayer oil. Even if there were such evidence, there is no evidence that Ribbke did so intentionally and in retaliation for plaintiff's filing complaints, as opposed to simply by accident.

However, I conclude that there is a genuine issue of material fact with respect to whether Ribbke refused plaintiff medical attention on July 7 in retaliation for his filing complaints. First, as mentioned above, it is reasonable to infer that refusing an inmate medical attention because he filed inmate complaints would deter a "person of ordinary firmness" from exercising his right to file complaints in the future. Second, plaintiff has set forth evidence that Ribbke refused to provide plaintiff medical care because of his grievances. Plaintiff has submitted declarations—both his own and his fellow prisoners'—in support of his allegation that in response to plaintiff's July 7 request for medical help, Ribbke stated

18

that "he was not going to help Akins get other staff in trouble with his bullshit complaints" and that Ribbke then walked away without providing him any medical care.  Although Ribbke denies that this interaction ever took place, "summary judgment cannot be used to resolve swearing contests between litigants."  Payne v. Pauley, 337 F.3d 767, 770 (7th Cir. 2003).  Accordingly, plaintiff is entitled to a trial on whether Ribbke denied him medical care the morning of July 7 and whether his reason for doing so was because plaintiff had filed complaints against him and other prison officials.


### D. Negligence Claim Against Maier

"Under Wisconsin law, medical malpractice has the same ingredients as garden-variety negligence claims: the plaintiff must prove that there was a breach of a duty owed that results in an injury."  Gil v. Reed, 535 F.3d 551, 557 (7th Cir. 2008) (citing Paul v. Skemp, 242 Wis. 2d 507, 625 N.W.2d 860, 865  (2001)).  I am dismissing plaintiff's state law negligence claim against defendant Maier because, as discussed above, plaintiff has failed to set forth sufficient evidence to create a genuine factual dispute with respect to whether Maier's decision to abruptly discontinue plaintiff's paroxetine caused the alleged "withdrawal" symptoms he experienced.  Moreover, even if there were evidence that Maier's failure to taper plaintiff off of his paroxetine caused his symptoms, plaintiff fails to present any evidence that this decision violated the standard of care Maier owed to plaintiff.

ORDER

IT IS ORDERED that

1.   The motion for summary judgment filed by defendants Gary Maier, Charles Ribbke and Joseph Krasovec, dkt. #33, is GRANTED with respect to plaintiff Arsenio Akins's claims against defendant Maier and Krasovec.  Defendants Maier and Krasovec are DISMISSED from the case.  Defendants' motion is also GRANTED with respect to plaintiff's Eighth Amendment claim against defendant Ribbke and his claim that Ribbke violated his rights under the First Amendment in connection with the July 16 cell search.

2. The motion for summary judgment filed by defendants is DENIED with respect to plaintiff's First Amendment claim that defendant Ribbke denied him medical attention on the morning of July 7 in retaliation for plaintiff's filing complaints against Ribbke and other prison officials.  A trial will be held on this claim.

3.  Plaintiff's motions for assistance with the recruitment of counsel, dkt. ##42 and 62, are DENIED.

Entered this 1st day of September, 2016.

BY THE COURT:

/s/

BARBARA B. CRABB
District Judge

20